**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NATHANIEL ORTIZ,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:23-cv-00203** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **UNITED STATES OF AMERICA, et al.,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Before the Court is Defendants' motion to dismiss and/or motion for summary judgment

filed pursuant to Rules 12(b) and 56 of the Federal Rules of Civil Procedure. (Doc. No. 19.)

Also before the Court is Plaintiff's motion to strike Defendants' motion to dismiss and/or motion

for summary judgment. (Doc. No. 31.) For the reasons set forth below, the Court will grant in

part and deny in part both of the parties' motions.

**I.     BACKGROUND**

**A.     Procedural Background**

Plaintiff Nathaniel Ortiz ("Plaintiff") is a convicted and sentenced federal prisoner in the

custody of the Federal Bureau of Prisons ("BOP"). (Doc. No. 1 at 4.) He is currently

incarcerated at Federal Correctional Institution Fort Dix ("FCI Fort Dix") in Joint Base MDL,

New Jersey. (Id. at 19.) On February 3, 2023, while Plaintiff was incarcerated at FCI Fort Dix,

he commenced the above-captioned action by filing a pro se complaint pursuant to the Federal

Tort Claims Act ("FTCA") and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388

(1971) ("Bivens"), concerning the allegedly inadequate medical care he received while

incarcerated at Federal Correctional Institution Schuylkill ("FCI Schuylkill"). (Id. at 3.)

Plaintiff's complaint names as Defendants the United States of America ("United States") and

the following individuals, all of whom work for the BOP: Ian Conners ("Conners"), a National

Inmate Appeals Administrator; Scott Finley ("Finley"), the Warden at FCI Schuylkill; Ellen

Mace-Leibson ("Mace-Leibson"), the clinical director at FCI Schuylkill.  (Id. at 2–3.)  In

addition, Plaintiff's complaint also names "John & Jane Does 1–10, XYZ Corps. 1–10, Comps.

1–10."  (Id.)

On May 18, 2023, the Court deemed Plaintiff's complaint filed and directed the Clerk of

Court to issue summonses with a copy of Plaintiff's complaint to the United States Marshal for

service upon Defendant United States in accordance with Rule 4(i)(1) of the Federal Rules of

Civil Procedure.  (Doc. No. 10.)  In addition, the Court also directed the Clerk of Court to serve a

copy of, inter alia, Plaintiff's complaint and waivers of the service of summons on the individual

Defendants (i.e., Defendants Conners, Finley, and Mace-Leibson).  (Id.)  On July 6, 2023, the

United States and the individual Defendants (collectively, "Defendants") requested an extension

of time in which to respond to Plaintiff's complaint, which was granted by the Court on July 10,

2023.  (Doc. Nos. 16, 17.)

Thereafter, on August 16, 2023, Defendants filed a motion to dismiss and/or motion for

summary judgment, followed by their supporting brief, statement of material facts, and

corresponding exhibits, arguing, inter alia, that Plaintiff's Bivens claim and FTCA claims should

be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) or for failure to state a

claim upon which relief can be granted under Rule 12(b)(6) and/or summary judgment should be

entered in their favor under Rule 56.  (Doc. Nos. 19, 24, 25.)  On October 10, 2023, Plaintiff

filed a motion for an extension of time in which to file a brief in opposition to Defendants'

motion to dismiss and/or motion for summary judgment.  (Doc. No. 27.)  The Court granted that

motion, and Plaintiff filed his brief in opposition on November 2, 2023.  (Doc. No. 29.)  Plaintiff

also filed a request for entry of default against Defendant Mace-Leibson (Doc. No. 30), as well

as a motion to strike Defendants' motion to dismiss and/or motion for summary judgment, which includes a supporting declaration (Doc. No. 31).  Following an extension of time (Doc. Nos. 32, 33), Defendants filed a reply brief on November 30, 2023, addressing Plaintiff's brief in opposition, as well as Plaintiff's motion to strike and supporting declaration (Doc. No. 34).

### B.    Factual Background

In accordance with the Court's Local Rules, Defendants have filed a statement of material facts in support of their motion for summary judgment.  (Doc. No. 24.)  Plaintiff did not file a counter statement of material facts, responding to the numbered paragraphs set forth in Defendants' statement, as required by the Court's Local Rules.  Thus, under the Court's Local Rules, Defendants' facts are deemed admitted because:

> A failure to file a counter-statement equates to an admission of all the facts set forth in the movant's statement. This Local Rule serves several purposes.  First, it is designed to aid the Court in its determination of whether any genuine issue of material fact is in dispute.  Second, it affixes the burden imposed by Federal Rule of Civil Procedure 56(e), as recognized in Celotex Corp. v. Catrett, on the nonmoving party 'to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designated specific facts showing that there is a genuine issue for trial.' 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted) (emphasis added).

See Williams v. Gavins, No. 13-cv-00387, 2015 WL 65080, at *5 (M.D. Pa. Jan. 5, 2015), aff'd sub nom. Williams v. Gavin, 640 F. App'x 152 (3d Cir. 2016) (unpublished) (emphasis in original) (citation omitted).  In fact, Defendants advised Plaintiff in their statement of material facts that, "pursuant to Local Rule 56.1, all facts set forth in [their] statement [would] be deemed admitted unless controverted by [Plaintiff] with references to the record supporting his position." (Doc. No. 24 at 1.)[1]

---

[1] As discussed more fully below, Plaintiff's motion (Doc. No. 31) to strike Defendants' motion to dismiss and/or motion for summary judgment will be denied to the extent that Plaintiff seeks

Accordingly, the material facts in this Memorandum are derived from Defendants' statement of undisputed material facts.  That being said, the Court has conducted a thorough and impartial review of the record in this matter.  To the extent that there are any disputed issues of material fact that are relevant to Defendants' motion for summary judgment, the Court expressly notes such disputes herein.

### 1.   Plaintiff's Incarceration History

Plaintiff is currently serving an aggregate sentence of three hundred and sixty (360) months imposed by the Southern District of New York for Conspiracy to Distribute and Possession with Intent to Distribute a Cocaine Base, see 21 U.S.C. § 846, and Brandishing a Firearm During and in Relation to a Narcotics Conspiracy, see 18 U.S.C. § 924.  (Doc. No. 24 ¶ 3.)  Plaintiff's expected release date, via Good Time Credit, is June 26, 2041.  (Id. ¶ 4.)  Plaintiff is currently incarcerated at FCI Fort Dix (id. ¶ 1), but the allegations underlying his claims arise from events that allegedly occurred between January 1, 2020, and January 11, 2022, while he was incarcerated at FCI Schuylkill (id. ¶ 2; id. ¶ 5 (stating that Plaintiff was housed at FCI Schuylkill from September 23, 2019, until October 27, 2022)).

### 2.   Plaintiff's Medical History

On February 27, 2020, Plaintiff had a preventative health visit with Registered Medical Assistant ("RMA") Delong, at which time Plaintiff reported "issues with left shoulder."  (Id. ¶ 27.)  RMA Delong assessed Plaintiff, noted that Plaintiff "[was] well and ha[d] no concerns at [that] time[,]" and counseled Plaintiff to "follow up for sick call as needed, eating healthy, and exercise." (Id. ¶ 28.)

---

discovery on his Eighth Amendment Bivens claim.  In other words, Plaintiff's motion to strike does not overcome his failure to file a responsive statement of material facts.

On March 2, 2020, Plaintiff reported to health services for an evaluation by Defendant Mace-Leibson.  (Id. ¶ 29.)  At that time, Plaintiff's chief complaint was back pain, and he identified his "trap" (i.e., his trapezius muscle) as the issue.  (Id. ¶ 30.)  Plaintiff reported that it had been "like that for a year" and "just got like that[.]"  (Id. ¶ 31.)  Plaintiff denied pain or any history of pain and stated that he was exercising regularly and doing deadlifts.  (Id.)  Plaintiff was most concerned with his trapezius muscles appearing asymmetrical; he wanted to "get it fixed" and said that "other guys told him it could be fat tumor that could be cut out."  (Id. ¶ 32.) Defendant Mace-Leibson examined Plaintiff and noted that "exam of ms is completely unchanged from his OCT 28, 2019 visit, no evidence of lipoma, it is shortened ms body c/w old injury (i.e., rupture distal tendon), ms otherwise well-defined and strength is symmetrical and normal b/l and he has obviously been working out regularly."  (Id. ¶ 33.)  Defendant Mace-Leibson provided Plaintiff a booklet on back care, discussed proper form and stretching, noted that his muscle is permanently shortened, and advised him that his issue was cosmetic.  (Id. ¶ 34.)

On March 13, 2020, Plaintiff failed to report for his scheduled appointment with the health services.  (Id. ¶ 35.)  On April 30, 2020, Certified Registered Nurse Practitioner ("CRNP") Swaboski evaluated Plaintiff in his cell for a sick call.  (Id. ¶ 36.)  Plaintiff complained that his left trapezius had been swollen for over a year, but he reported no pain or injury, and he denied numbness, weakness, or loss of function in his left arm.  (Id.)  CRNP Swaboski's exam noted: "Swelling and asymmetry noted left trapezius. Inmate observed reaching left arm above head without difficulty. Well-developed upper body musculature noted." (Id. ¶ 37.)  CRNP Swaboski counseled Plaintiff to utilize sick call as needed.  (Id. ¶ 38.)

Plaintiff did not seek medical services again until June 16, 2020, when CRNP Swaboski treated him during a sick call in the housing unit.  (Id. ¶ 39.)  At that time, Plaintiff complained of "constant pain left neck and shoulder[,]" which he described as "nerve pain[,]" and he reported taking ibuprofen as needed, but that it was not effective.  (Id. ¶ 40.)  CRNP Swaboski assessed Plaintiff and reported "swelling and asymmetry" in his left trapezius.  (Id. ¶ 41.)  CRNP Swaboski discussed the cosmetic nature of the issue with the Clinical Director, and recommended over-the-counter analgesics as needed and determined that no further treatment was necessary at that time. (Id. ¶ 42.)

On June 25, 2020, CRNP Swaboski noted that during medical rounds Plaintiff requested further medical treatment due to increasing pain in the left side of his neck. (Id. ¶ 43.)  CRNP Swaboski noted that Plaintiff did not appear to be in acute distress, nor did he show any functional deficit.  (Id.)  CRNP Swaboski discussed Plaintiff's issue with the Clinical Director and concluded that no further treatment was indicated "at this time[,]" and the current treatment plan was reinforced.  (Id. ¶ 44.)

During medical rounds on July 8, 2020, Plaintiff requested further medical treatment due to increasing pain in the left side of his neck.  (Id. ¶ 45.)  CRNP Swaboski noted that Plaintiff did not appear to be in "acute distress" and did not have any "functional deficit[,]" and CRNP Swaboski determined that no further treatment was indicated at that time.  (Id. ¶ 46.)  Plaintiff did not seek medical attention again until September 8, 2020, when he was seen by Physician Assistant ("PA") Steffan at health services regarding a testicular lump and shoulder pain.  (Id. ¶ 47.)  At the September 8, 2020 visit, Plaintiff refused a testicle/scrotal exam, but he questioned what would be done to treat his trapezius muscle; PA Steffan noted that Plaintiff was convinced he has "nerve damage."  (Id. ¶ 48.)  PA Steffan educated Plaintiff on signs and symptoms related

to his testicular issues and the findings of his multiple prior visits regarding his shoulder/trapezius muscle.  (Id. ¶ 49.)  PA Steffan also counseled Plaintiff to follow up with sick call as needed and to return if his condition did not improve.  (Id.)

On March 4, 2021, Plaintiff testified positive for COVID-19, but denied any "symptoms or complaints" and did not have any "fatigue, aches, pains, headache, persistent pain in chest." (Id. ¶¶ 50–51.)  On March 23, 2021, Plaintiff was a "no-show" for his Health Service appointment concerning an inhaler. (Id. ¶ 52.)

On May 10, 2021, Registered Nurse ("RN") McIntyre examined Plaintiff in the housing unit, at which time Plaintiff complained: "I have a torn ligament in my shoulder and it keeps getting bigger. I think it's affecting my breathing. I told them I needed my inhaler back." (Id. ¶ 53.)  RN McIntyre's assessment noted that Plaintiff had "baseball size swelling" of his left shoulder, internal pain to palpation, and no erythema.  (Id. ¶ 54.)  RN McIntyre further noted that Plaintiff reported affected breathing; however, his lungs were clear, his Sp02 was 98%, and he did not show for his last call out to receive his inhaler.  (Id. ¶ 55.)  RN McIntyre recommended that Plaintiff be evaluated further and follow up with sick call as needed.  (Id. ¶ 56.)

The next day, on May 11, 2021, PA Andreuzzi evaluated Plaintiff at health services regarding his reported shortness of breath and shoulder pain.  (Id. ¶ 57.)  PA Andreuzzi noted that Plaintiff was "very evasive in answering questions, giving vague answers, no answer at all or changing the subject when asked questions."  (Id. ¶ 58.)  Regarding Plaintiff's reported shortness of breath, Andreuzzi noted that Plaintiff alleged that he was diagnosed with asthma in 2003, that he had not had an inhaler since 2016, and had not needed it until then.  (Id. ¶ 59.) Plaintiff also indicated that he smoked for five (5) to six (6) years in the past but not for the last seventeen (17) years.  (Id. ¶ 60.)  Regarding his reported left trapezius/shoulder pain, Plaintiff

reported that he injured it in 2019 while housed at a different federal correctional institution.  (Id. ¶ 61.)  During this visit, PA Andreuzzi attempted to inquire further into Plaintiff's injury, and Plaintiff stated that he was working out and that it was swollen the next day. (Id. ¶ 62.)  PA Andreuzzi reported asking Plaintiff several times what specifically he did to injure his shoulder and how long it had been swollen, but Plaintiff would not answer.  (Id. ¶ 63.)  Plaintiff only stated that it was getting bigger and causing pain in his left arm and chest.  (Id.)  PA Andreuzzi ordered a consultation request for Plaintiff's left trapezius area, noting that the mass was "4 inches wide and 3 inches high, firm, tender to palpation, little mobility."  (Id. ¶ 64.)

The following day, on May 12, 2021, PA Andreuzzi examined Plaintiff after a lieutenant sent Plaintiff to health services for complaints of chest pain.  (Id. ¶ 65.)  Plaintiff reported that the lump in his left trapezius was "causing mad pain[,]" and he asked if it could be causing pain in his chest.  (Id. ¶ 66.)  PA Andreuzzi examined Plaintiff, discussed cardiac versus non-cardiac chest pain, reviewed his EKG, and answered Plaintiff's questions.  (Id. ¶ 67.)  PA Andreuzzi also informed Plaintiff that he ordered a consult for his trapezius mass, which was pending approval and scheduling.  (Id.)

On May 16, 2021, Plaintiff hit the duress button at 4:00 a.m. after waking "with trouble breathing and pain/stiffness" in his left arm/hand.  (Id. ¶ 68.)  Upon examination, Plaintiff's fingertips were cold to the touch and his capillary refill was delayed.  (Id. ¶ 69.)  Plaintiff was sent to a local emergency room for further evaluation.  (Id. ¶ 70.)  That same day, Plaintiff returned from the hospital with a diagnosis of lipoma (i.e., "a noncancerous (benign) tumor that is made up of fat cells").  (Id. ¶¶ 71, 73; Doc. No. 24-2 at 274.)  The hospital's discharge instructions recommended "pain medication as needed" and to "consider surgical referral." (Doc. No. 24 ¶ 72.)  The records and report from the hospital (LVH-East Norwegian St.

Emergency) were scanned into Plaintiff's BOP medical file, and the records explain that: lipomas are "a very common type of soft-tissue growth[,]" which "are usually found under the skin" and "may occur in any tissue of the body that contains fat[,]" such as "the back, arms, shoulders, buttocks, and thighs."  (Doc. No. 24-2 at 274.)

On May 20, 2021, after consultation with the clinical director, PA Andreuzzi noted that an inhaler was not clinically indicated, and he cancelled the previously ordered ultrasound consult.  (Doc. No. 24 ¶ 74.)  PA Andreuzzi also noted that he would request a general surgery consult once the CT scan report was received from the hospital.  (Id.)

Shortly thereafter, on May 26, 2021, PA Andreuzzi met with Plaintiff in the housing unit to discuss his lipoma, the treatment plan, and an inhaler.  (Id. ¶ 75.)  When discussing the lipoma, PA Andreuzzi informed Plaintiff that a lipoma is non-cancerous and that a surgical consult will determine what happens next.  (Id. ¶ 76.)  Plaintiff indicated that he had been purchasing pain medication from the commissary, but that it was not effective.  (Id. ¶ 77.)  When discussing the inhaler, PA Andreuzzi explained to Plaintiff that his request for an inhaler had been denied because there was no indication that he needed one.  (Id. ¶ 78.)  PA Andreuzzi also documented that Plaintiff continued to be evasive in answering questions and that a review of Plaintiff's inmate record for the prior six (6) months only showed one purchase of Motrin on May 25, 2021, which contradicted Plaintiff's claim that he had been buying and taking pain medication.  (Id. ¶ 79.)  PA Andreuzzi "continue[d] to believe" that Plaintiff's actions were driven by a "secondary agenda."  (Id.)  PA Andreuzzi subsequently requested a surgery consultation for Plaintiff's lipoma on September 8, 2021.  (Id. ¶ 80; Doc. No. 24-2 at 126.)

On June 2, 2021, Plaintiff allegedly became confrontational with PA Andreuzzi while he was assessing him for a sick call at the housing unit.  (Id. ¶ 81.)  During this interaction, Plaintiff

claimed that he was prescribed pain medication, but that it was being refused to him.  (Id. ¶ 82.)

Plaintiff also claimed to be taking over-the-counter ("OTC") pain medication, which had no

effect.  (Id. ¶ 83.)  PA Andreuzzi challenged Plaintiff's claim that he had been taking OTC

medication based upon a review of Plaintiff's commissary purchases, which revealed that he had

only made one (1) purchase of Motrin on May 25, 2021.  (Id. ¶ 84.)  PA Andreuzzi also reviewed

the hospital records, and pain medication had not been prescribed for Plaintiff.  (Id. ¶ 85.)  PA

Andreuzzi once again noted his concern that Plaintiff may have a "secondary agenda" because

Plaintiff continued to provide information that was not supported by the record.  (Id. ¶ 86.)

On August 19, 2021, PA Andreuzzi noted that Plaintiff presented to health services,

questioning why he had not been seen for his neck mass, and PA Andreuzzi explained the

process of requesting a surgical consult, approving the request, and scheduling a consult.  (Id. ¶

87.)  PA Andreuzzi further informed Plaintiff that the consult had been scheduled but that the

lipoma would not be removed at that time and that another surgical appointment would need to

be ordered, approved, and scheduled.  (Id. ¶ 88.)  Plaintiff became confrontational about pain

medication and claimed that he purchased Motrin and cannot take it because it hurts his stomach

(id. ¶ 89); PA Andreuzzi advised Plaintiff to purchase Tylenol for pain and terminated the visit

(Id. ¶ 90).  PA Andreuzzi again reviewed Plaintiff's commissary records which indicated that he

only purchased pain medication on May 25th, June 2nd, and June 30th of 2021.  (Id. ¶ 91.)  PA

Andreuzzi noted his continued concern that Plaintiff's actions were motivated by a "secondary

agenda" because Plaintiff continued to provide information not supported "by record."  (Id. ¶

92.)

On August 26, 2021, Plaintiff met with Dr. Fisher of the Integrated Medical Group, P.C.

concerning a "large, soft tissue mass at the base of his left neck."  (Id. ¶ 93.)  The mass (i.e., the

lipoma) on Plaintiff's neck measured "20cm x 12cm" and Dr. Fisher recommended "surgical excision under general anesthesia." (Id. ¶ 94.)  On September 8, 2021, PA Andreuzzi requested a surgical appointment to have the mass removed.  (Id. ¶ 95.)  On September 22, 2021, PA Andreuzzi ordered labs for Plaintiff's pending surgery.  (Id. ¶ 96.)  On September 28, 2021, PA Andreuzzi met with Plaintiff concerning his shoulder pain and vision issues, at which time PA Andreuzzi reminded Plaintiff that he had been placed on the optometrist schedule and that he needed to purchase OTC pain medication from the commissary.  (Id. ¶ 97.)

On October 8, 2021, Dr. Fisher removed the lipoma which weighed 263 grams and measured 14 x 8 x 5 cm.  (Id. ¶ 98.)  On October 8, 2021, Plaintiff returned from surgery, and PA Andreuzzi noted Plaintiff's prescribed medication and wound care recommendations.  (Id. ¶ 99.)  The medical staff at FCI Schuylkill provided Plaintiff with wound care on October 12, 14, 15, and 16, 2021.  (Id. ¶ 100.)  In addition, on November 16, 2021, CRNP Swaboski ordered a surgical follow-up appointment to occur by December 29, 2021.  (Id. ¶ 101.)  On December 9, 2021, FCI Schuylkill staff transported Plaintiff to his surgical follow-up appointment with Dr. Fisher at Integrated Medical Group, P.C.; however, upon arrival to that appointment, a BOP lieutenant who had taken Plaintiff was advised that the appointment had been cancelled without advance notice to the prison.  (Id. ¶ 102.)

On January 3, 2022, Plaintiff had his post-surgical consultation at Integrated Medical Group, P.C., at which time he expressed no complaints of pain or discomfort at the surgical site. (Id. ¶ 103.)  Dr. Fisher noted that Plaintiff did not have any restrictions from a surgical standpoint, and no further surgical follow-up was scheduled.  (Id. ¶ 104.)  BOP medical records show that Plaintiff did not seek medical attention for his trapezius/shoulder for the remainder of

his time in custody at FCI Schuylkill.  (Id. ¶ 105.)  On October 27, 2022, Plaintiff was

transferred out of the custody of FCI Schuylkill.  (Id. ¶ 106.)

### 3. Plaintiff's FTCA Administrative Remedy History

Plaintiff filed one administrative tort remedy concerning his medical care at FCI

Schuylkill.  (Id. ¶ 107.)  The BOP Regional Counsel Office received Plaintiff's SF-95 on March

10, 2022.  (Id. ¶ 108.)  In that SF-95, Plaintiff alleged negligence of BOP staff in failing to

properly treat his lipoma such that it caused him to live with severe pain and permanent damage.

(Id. ¶ 109.)  For relief, Plaintiff sought $5,000,000 in damages.  (Id. ¶ 109.)  The BOP Regional

Counsel Office docketed Plaintiff's claim as Claim No. TRT-NER-2022-04835 and rejected the

filing on April 8, 2022, for failure to identify the date on which the negligence occurred.  (Id. ¶

110.)

On May 18, 2022, Plaintiff resubmitted his SF-95, identifying the date on which the

incident occurred as March 12, 2021.  (Id. ¶ 111.)  In his second (or amended) SF-95 Plaintiff

again alleged that BOP staff were negligent in failing to properly treat his lipoma such that it

caused him to live with severe pain and permanent damage, and he sought $5,000,000 in

damages.  (Id. ¶ 112.)  On August 22, 2022, the BOP Regional Counsel Office denied Plaintiff's

administrative tort claim (id. ¶ 113) based upon a review of his medical records which failed to

substantiate his tort claims (id. ¶ 114)  Specifically, BOP Regional Counsel determined that

Plaintiff received medical care, had no post-surgery complaints of pain, and there was no

evidence that Plaintiff experienced a compensable loss as the result of negligence of any BOP

employees.  (Id. ¶ 115.)

## II.      LEGAL STANDARDS

### A.      Rule 12(b)(1) of the Federal Rules of Civil Procedure

"A challenge to subject matter jurisdiction under Rule 12(b)(1) may be either a facial or a factual attack."  Davis v. Wells Fargo, 824 F.3d 333, 346 (3d Cir. 2016). "A court ruling on a facial attack considers only the complaint, viewing it in the light most favorable to the plaintiff." Long v. SEPTA, 903 F.3d 312, 320 (3d Cir. 2018) (citation omitted).  However, a court ruling on a factual attack, wherein the defendant contests the truth of the jurisdictional allegations, "is a different matter: the court need not treat the allegations as true[.]"  See id. (citations omitted).

"In reviewing a factual attack, the court may consider evidence outside the pleadings." Gould Elecs. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000) (citation omitted).  Indeed, "[b]ecause at issue in a factual 12(b)(1) motion is the trial court's . . . very power to hear the case[,] there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  In other words, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."  See id.

### B.      Rule 12(b)(6) of the Federal Rules of Civil Procedure

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests.  See Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008).  The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief.  See Fed. R. Civ. P. 8(a).  Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure

12(b)(6) for its "failure to state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court accepts as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff. See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010). To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that their claims are facially plausible. See Iqbal, 556 U.S. at 678; Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct: "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" See Iqbal, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

Accordingly, the United States Court of Appeals for the Third Circuit ("Third Circuit") has identified the following steps that a district court must take when reviewing a 12(b)(6) motion: (1) identify the elements that a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint that are "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief." See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (internal citations and quotation marks omitted). The Third Circuit has specified that in ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based

14

upon these documents." See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing

Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

In the context of pro se prisoner litigation, the court must be mindful that a document

filed pro se is "to be liberally construed." See Estelle v. Gamble, 429 U.S. 97, 106 (1976). A

pro se complaint, "however inartfully pleaded," must be held to "less stringent standards than

formal pleadings drafted by lawyers" and can be dismissed for failure to state a claim only if it

appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that

would entitle him to relief. See Haines v. Kerner, 404 U.S. 519, 520–21 (1972).

### C.     Rule 56 of the Federal Rules of Civil Procedure

Federal Rule of Civil Procedure 56(a) requires the Court to render summary judgment "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). "[T]his standard provides

that the mere existence of some alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be no

genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the

outcome of the case under applicable substantive law. See id. at 248; Gray v. York Newspapers,

Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). A dispute of material fact is "genuine" if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson, 477

U.S. at 257; Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283,

1287–88 (3d Cir. 1991).

When determining whether there is a genuine dispute of material fact, the Court must

view the facts and all reasonable inferences in favor of the nonmoving party. See Moore v.

Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consol. Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988).  In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings.  When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence that demonstrates the absence of a genuine dispute of material fact, the nonmoving party is required to go beyond his pleadings with affidavits, depositions, answers to interrogatories, or the like in order to demonstrate specific material facts that give rise to a genuine dispute.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts."  See Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).  When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case that it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  See Celotex, 477 U.S. at 323; see also Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

As noted supra, when determining whether a dispute of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party.  See White, 862 F.2d at 59.  In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor.  See id. (citations omitted).  However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in

16

the statement required to be served by the moving party will be deemed to be admitted."  See L.R. 56.1.  A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a pro se litigant.  These rules apply with equal force to all parties.  See Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 245 (3d Cir. 2013) (noting that pro se parties "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants").

## III.   DISCUSSION

As discussed below, the Court will grant Defendants' motion to dismiss Plaintiff's Bivens claim under Rule 12(b)(1) for lack of subject matter jurisdiction.  In light of this ruling, the Court need not reach Defendants' alternative arguments that the individual Defendants are entitled to qualified immunity on Plaintiff's Bivens' claim or that Plaintiff failed to administratively exhaust his Bivens claim as it relates to Defendant Finley.  In addition, the Court will grant Defendants' motion to dismiss Plaintiff's FTCA claim for failure to supervise under Rule 12(b)(1) for lack of subject matter jurisdiction.  However, the Court will deny Defendants' motion to dismiss Plaintiff's FTCA claims for ordinary negligence, medical negligence, and negligent infliction of emotional distress under Rule 12(b)(6) for failure to state claims upon which relief can be granted.  Finally, the Court will deny Defendants' motion for summary judgment under Rule 56 as to Plaintiff's FTCA claims for ordinary negligence, medical negligence, and negligent infliction of emotional distress, and the Court will grant Plaintiff's motion to strike and supporting declaration to the limited extent that he seeks the opportunity to conduct discovery on these surviving claims.

A. **Defendants' Motion to Dismiss and/or Motion for Summary Judgment**

1. **Plaintiff's <u>Bivens</u> Claim**

In his complaint, Plaintiff asserts a <u>Bivens</u> claim against Defendants Mace-Leibson and Finley for violations of his Eighth Amendment rights.  (Doc. No. 1 at 16.)  In pertinent part, Defendants argue that the Court should dismiss Plaintiff's <u>Bivens</u> claim under Rule 12(b)(1) for lack of subject matter jurisdiction.  <u>See</u> (Doc. Nos. 19, 25).  In support of this argument, Defendants assert that, under well-established United States Supreme Court ("Supreme Court") precedent, this case presents a new context and special factors counsel against implying a cause of action for money damages under <u>Bivens</u>.  <u>See</u> (Doc. No. 25 at 34–49).  The Court agrees and begins its discussion with an overview of <u>Bivens</u>.

"In 1871, Congress passed a statute that was later codified at Rev. Stat. § 1979, 42 U.S.C. § 1983."  <u>Ziglar v. Abbasi</u>, 582 U.S. 120, 130 (2017) ("<u>Abbasi</u>").  This statute "entitles an injured person to money damages if a state official violates his or her constitutional rights."  <u>See</u> <u>id.</u>  Congress, however, "did not create an analogous statute for federal officials."  <u>See</u> <u>id.</u>  In other words, Congress did not provide a money damages remedy for persons whose constitutional rights were violated by federal officials.  <u>See</u> <u>id.</u>

One-hundred (100) years later in 1971, the Supreme Court decided <u>Bivens</u>.  <u>See</u> <u>id.</u>  In that case, the Supreme Court held that there is an implied cause of action for money damages when a federal official, acting under color of his authority, violates the Fourth Amendment's prohibition against unreasonable searches and seizures.  <u>See</u> <u>Xi v. Haugen</u>, 68 F.4th 824, 832 (3d Cir. 2023) ("<u>Haugen</u>"). The Supreme Court recognized that "the Fourth Amendment does not in so many words" provide for an award of money damages as a consequence of its violation, but nevertheless explained that, "where legal rights have been invaded, and a federal statute provides

for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done."  See Bivens, 403 U.S. at 396 (citation and internal quotation marks omitted).

In the decade following Bivens, the Supreme Court implied a cause of action for money damages pursuant to Bivens in two (2) other contexts: one under the Fifth Amendment's Due Process Clause for gender discrimination in the employment context, see Davis v. Passman, 442 U.S. 228, 248–49 (1979); and the other under the Eighth Amendment's Cruel and Unusual Punishment Clause in the prison medical care context, see Carlson v. Green, 446 U.S. 14, 23–25 (1980).  See Haugen, 68 F.4th at 832.

In 2017, however, the Supreme Court "made clear" in Abbasi that any further expansion of Bivens "is now a disfavored judicial activity."  See Abbasi, 582 U.S. at 135 (citation and internal quotation marks omitted); Hernandez v. Mesa, 140 S. Ct. 735, 741 (2020) (explaining that, after the Supreme Court's decisions in Davis and Carlson, "the Court changed course"); Mack v. Yost, 968 F.3d 311, 318 (3d Cir. 2020) (explaining that "the Supreme Court has consistently refused to expand Bivens actions beyond these three specific contexts"—i.e., Bivens, Davis, and Carlson (footnote omitted)).

Thus, in order to curb expansion of Bivens, the Supreme Court has established a rigorous two (2)-part inquiry for courts to follow when determining whether a Bivens action should be extended to a new context.  See Haugen, 68 F.4th at 833.  Courts must first determine "whether a case presents a new Bivens context" by asking "[i]f the case is different in a meaningful way from previous Bivens cases decided by [the Supreme] Court[.]"  See Abbasi, 582 U.S. at 139. And if the case presents a new Bivens context, then courts must next determine whether any

special factors counsel hesitation in allowing an expansion of the doctrine.  See Haugen, 68 F.4th

at 833.  Such special factors include:

> the rank of the officers involved; the constitutional right at issue; the generality
> or specificity of the official action; the extent of judicial guidance as to how an
> officer should respond to the problem or emergency to be confronted; the
> statutory or other legal mandate under which the officer was operating; the risk
> of disruptive intrusion by the Judiciary into the functioning of other branches;
> or the presence of potential special factors that previous Bivens cases did not
> consider.

See Abbasi, 582 U.S. at 140.

More recently, however, the Supreme Court decided Egbert v. Boule, 596 U.S. 482

(2022).  In that case, the Supreme Court clarified the framework that courts are to use before

implying a cause of action for money damages in a new Bivens context.  The Supreme Court

recognized its precedents that describe the two (2)-part inquiry discussed above but explained

that these two (2) parts "often resolve to a single question: whether there is any reason to think

that Congress might be better equipped to create a damages remedy."  See id. at 492.  The

Supreme Court further explained that, "[i]f there is even a single reason to pause before applying

Bivens in a new context, a court may not recognize a Bivens remedy."  See id. (citation and

internal quotation marks omitted).

Thus, the outcome of Egbert is, essentially, that extending a Bivens remedy to a new

context will be unavailable in all but the most unusual of cases.  See id. (instructing that "[i]f

there is a rational reason" to think that Congress is better equipped to create a damages remedy,

"as it will be in most every case, . . . no Bivens action may lie").  In other words, the Supreme

Court has "all but closed the door on Bivens remedies."  See Dyer v. Smith, 56 F.4th 271, 277

(4th Cir. 2022) (citation omitted); Haugen, 68 F.4th at 833 (explaining that, in the many years

since <u>Bivens</u> was decided, "the Supreme Court has pulled back the reins to what appears to be a full stop and no farther").

Guided by this precedent, the Court turns to the issue of whether Plaintiff's <u>Bivens</u> claim presents a new context, and, if so, whether any special factors counsel against extending a <u>Bivens</u> remedy to his case.

### a.   New Context

Plaintiff asserts a <u>Bivens</u> claim against Defendants Mace-Leibson and Finley for violations of his Eighth Amendment rights in connection with the allegedly inadequate medical care he received for his lipoma at FCI Schuylkill.  (Doc. No. 1 at 16.)  As explained by the Supreme Court, a <u>Bivens</u> claim arises in a new context when a case is "different in a meaningful way from previous <u>Bivens</u> cases decided" by the Supreme Court.  <u>See</u> <u>Abbasi</u>, 582 U.S. at 139.

As an initial matter, the Court finds that Plaintiff's <u>Bivens</u> claim bears no resemblance to <u>Bivens</u> (a Fourth Amendment "claim against FBI agents for handcuffing a man in his own home without a warrant") or <u>Davis</u> (a Fifth Amendment "claim against a Congressman for firing his female secretary)[.]"  <u>See</u> <u>Abbasi</u>, 582 U.S. at 140 (citations omitted).  However, the Court finds that Plaintiff's <u>Bivens</u> claim bears some resemblance to <u>Carlson</u>.

In <u>Carlson</u>, a federal inmate with chronic severe asthmatic condition died after BOP prison officials allegedly kept him in a grossly inadequate medical facility against the advice of doctors, failed to give him competent medical care for some eight (8) hours after he suffered an asthmatic attack, administered contraindicated drugs that made his asthmatic attack more severe, attempted to use a respirator known to be inoperative which only further impeded his breathing, and unjustifiably delayed transferring him to a hospital.  <u>See</u> <u>Carlson</u>, 446 U.S. at 17 n.1. Against <u>Carlson</u>'s backdrop, the Court turns to the undisputed material facts of this case.

On February 27, 2020, Plaintiff had a preventative health visit with RMA Delong at which time he complained of "issues" with his "left shoulder." (Doc. Nos. 24 ¶ 27; 24-2 at 74.)  Just a few days later, on March 2, 2020, Plaintiff met with Defendant Mace-Leibson (Doc. Nos. 24 ¶¶ 27, 29; 24-2 at 70), and he complained of "back pain" and reported that his trapezius muscle was the issue (Doc. Nos. 24 ¶ 29–30; 24-2 at 70).  Defendant Mace-Leibson noted that Plaintiff had previously suffered a ruptured distal tendon in that region, but that there was "no evidence of lipoma[.]"  (Doc. Nos. 24 ¶ 33; 24-2 at 72.)  On April 30, 2020, CRNP Swaboski evaluated Plaintiff in his cell and spoke with him about his left trapezius. (Doc. Nos. 24 ¶¶ 36–37; 24-2 at 67.)  Plaintiff denied having any pain or loss of function with his left arm (Doc. Nos. 24 ¶ 36; 24-2 at 67), and he was observed reaching his left arm above his head "without difficulty" (Doc. Nos. 24 ¶ 37; 24-2 at 67).  Plaintiff was then reevaluated on June 16, June 25, July 8, and September 8, 2020, regarding pain in his left neck and/or shoulder area.  (Doc. Nos. 24 ¶¶ 39–49; 24-2 at 59, 63–65.)  During these evaluations, it was noted that Plaintiff did not appear to be in acute distress or show any signs of functional deficit.  (Id.)  Then, from September 2020 to the beginning of May 2021, there is no indication in Plaintiff's BOP medical records that he sought further medical attention for his neck and/or shoulder area; however, he was seen by medical staff at FCI Schuylkill for other reasons. (Doc. No. 24 ¶¶ 50–52.)

However, it appears that his circumstances began to change on May 10, 2021, when Plaintiff complained of swelling in his shoulder and stated, "I have a torn ligament in my shoulder and it keeps getting bigger."  (Doc. Nos. 24 ¶ 53; 24-2 at 145.)  At that time, Plaintiff's left shoulder was documented as having "baseball size swelling[.]"  (Doc. Nos. 24 ¶¶ 53–54; 24-2 at 146.)  In addition to this swelling, Plaintiff reported that his torn ligament

was affecting his breathing.  (Id.)  As a result, RN McIntyre, the medical personnel who

assessed Plaintiff that day, recommended that he be further evaluated, and the very next day,

PA Andreuzzi evaluated Plaintiff.  (Doc. Nos. 24 ¶ 62; 24-2 at 142.)  PA Andreuzzi noted that,

during this evaluation, Plaintiff was not answering questions, was providing vague answers, or

was changing the subject.  (Doc. Nos. 24 ¶¶ 56–58, 63; 24-2 at 142.)[2]  Despite Plaintiff's

alleged obfuscation, PA Andreuzzi recommended a "US consult" (an ultrasound consult) for

Plaintiff's left trapezius area, and PA Andreuzzi measured the "mass" in Plaintiff's left

trapezius as: 3.5 inches in length, 4 inches wide, and 3 inches high. (Doc. Nos. 24 ¶¶ 56–58,

63; 24-2 at 143.)  The following day, PA Andreuzzi reevaluated Plaintiff, who reported that

his left trapezius was "causing mad pain" and asked if it could be causing pain in his chest.

((Doc. Nos. 24 ¶¶ 65–66; 24-2 at 140.)  At that time, PA Andreuzzi had a discussion with

---

[2]  More specifically, PA Andreuzzi noted as follows in his clinical encounter with Plaintiff on
May 11, 2021:

> Inmate sent to HSU from mainline to be evaluated for c/o SOB and left shoulder
> pain. Inmate was very evasive in answering questions, giving vague answers, no
> answer at all or changing the subject when asked questions. States was
> diagnosed in 2003 with asthma but doesn't know and/or can't remember what
> type of testing was done to determine [he] had it. States only had a rescue
> inhaler. Asked if ever used long acting inhaler several times and would never
> give an answer. States now is experiencing SOB at night and needs his inhaler
> back. States has not had an inhaler since 2016 and didn't need it until now.
> Asked what causes to feel SOB or triggers asthma and says it depends what
> causes it and will not give more definite answer than this. States did smoke 1
> ppd for 5–6 years but not in last 17 years. States when had inhaler would use it
> 2 times a day. Also states having pain in left trap/shoulder. States initially injured
> in 2019 while at Ray brook but they didn't do anything for it as they were
> sending me here and we would take care of it. Asked how injured and states was
> working out and next day got swollen. Asked several times what specifically did
> to injure and will not say. Asked several times how long has been swollen and
> will not say. Just that it is getting bigger. States is causing pain in left arm and
> chest but nothing further.  Denies additional complaints.

(Doc. No. 24-2 at 142.)

Plaintiff concerning cardiac versus non-cardiac chest pain, and he answered Plaintiff's questions. (Doc. No. 24-2 at 141.) PA Andreuzzi also informed Plaintiff that a "US consult" for his left trapezius had been requested and that it was awaiting approval and scheduling. (Id.)

Less than one week later, on May 16, 2021, Plaintiff woke up at 4:00 a.m. and hit the duress button because he was having trouble breathing and had pain and stiffness in his left arm and hand. (Doc. Nos. 24 ¶ 68, 63; 24-2 at 136.)  Plaintiff was promptly sent to a local emergency room where he was formally diagnosed with a lipoma, which is a "noncancerous (benign) tumor that is made up of fat cells." (Doc. Nos. 24 ¶¶ 70–73; 24-2 at 132.)  The hospital physician recommended that Plaintiff be given "OTC pain medication" as needed and recommended that a surgical referral be made. (Doc. Nos. 24 ¶ 72; 24-2 at 132.)  In accordance with the hospital's recommendation, BOP medical staff submitted a general surgery consult on May 26, 2021 (Doc. Nos. 24 ¶ 80; 24-2 at 130), and on August 26, 2021, the general surgeon recommended a surgical removal of Plaintiff's lipoma (Doc. Nos. 24 ¶¶ 93–94; 24-2 at 130).  Thereafter, on October 8, 2021, Plaintiff's lipoma was surgically removed (Doc. Nos. 24 ¶ 98; 24-2 at 190), and Plaintiff was returned to FCI Schuylkill that same day, where he was provided medical care, including wound care, by medical staff until his surgical follow-up appointment on January 3, 2022, at which time he was fully discharged from the general surgeon's care (Doc. Nos. 24 ¶¶ 99–104; 24-2 at 386–87).

While the Court does not dismiss any pain or emotional distress that Plaintiff may have suffered from during this time at FCI Schuylkill, the Court finds that there are meaningful differences between the facts of this case and those of Carlson.  Most notably, Plaintiff's medical condition of having a lipoma (a fatty tumor found below the skin, typically in areas such as the

24

back, arms, and shoulders) was not life-threatening.  In addition, Plaintiff's medical records reflect that he received routine medical attention at FCI Schuylkill for his complaints and that, when his condition worsened, the medical staff at FCI Schuylkill promptly sent him to a local hospital, followed the hospital's recommendations to pursue a surgical consult, and ensured that Plaintiff not only received the recommended surgery but had follow-up medical care after that surgery.  Thus, while the "right at issue" (i.e., the Eighth Amendment) and the alleged "mechanism of injury" (i.e., the failure to provide adequate medical care) are the same as Carlson, the Court concludes that Plaintiff's case seeks to extend Carlson to a new context.[3]  See Abbasi, 582 U.S. at 139 (explaining that even claims which challenge the failure to provide medical treatment can involve the same "right at issue" and "mechanism of injury" as Carlson, but still have "different" contexts (citing Malesko, 534 U.S. at 64, 70, and n.4)); see also id. at 147 (instructing that "even a modest extension is still an extension" of Bivens).

   In addition to these identified differences between Carlson and this case, the Supreme Court has "explained that a new context arises when there are 'potential special factors that previous Bivens cases did not consider.'"  See Egbert, 596 U.S. at 492 (quoting Abbasi, 582 U.S. at 140).  As discussed below, the Court finds that there are special factors, here, which counsel against extending a Bivens remedy to Plaintiff's case.  The Court further finds that these special factors were not considered by the Supreme Court in Carlson and that, because of this, the Court is only further guided to conclude that Plaintiff's Bivens claim presents a new context.  See Abbasi, 582 U.S. at 148 (instructing that "a case can present a new context for Bivens purposes . . . if there are potential special factors that were not considered in previous Bivens cases"

---

[3]  Although Plaintiff's complaint seems to suggest that his left trapezius was never physically examined, assessed, or treated, see, e.g., (Doc. No. 1 at ¶¶ 10, 12–14, 17, 26, 31), this is in direct contradiction with numerous BOP medical records.

(citation omitted)); see also Egbert, 596 U.S. at 492 (acknowledging overlap between the two (2)-part inquiry outlined by Supreme Court precedent insofar that the two (2) parts "often resolve to a single question[,]" i.e., "whether there is any reason to think that Congress might be better equipped to create a damages remedy").

Accordingly, while the Court has no hesitation in accepting that Carlson and this case both involve an Eighth Amendment claim of inadequate medical care in the prison context, "these superficial similarities are not enough to support the judicial creation of a cause of action." See Egbert, 596 U.S. at 495 (explaining that "almost parallel circumstances" or "superficial similarities" with Bivens, Davis, and Carlson "are not enough to support the judicial creation of a cause of action" (citation and internal quotation marks omitted)); see also Abbasi, 582 U.S. at 149 (stating as follows: "[g]iven this Court's expressed caution about extending the Bivens remedy, . . . the new-context inquiry is easily satisfied"); Braxton v. United States, No. 23-cv-00089, 2023 WL 4166094, at *6 (M.D. Pa. June 23, 2023) (concluding that the federal prisoner's Eighth Amendment Bivens claim presented a new context where his complaint alleged that the medical defendant was deliberately indifferent in failing to diagnose him with multiple myeloma). As such, the Court concludes that Plaintiff's Bivens claim arises in a new context.

**b.    Special Factors**

Because Plaintiff's Bivens claim arises in a new context, the Court must next determine under Abbasi and Egbert whether there are any special factors that counsel hesitation in the Court extending a Bivens remedy to his claim. As explained by the Supreme Court, a special factor suggests that Congress is better equipped than the judiciary to "weigh the costs and benefits" of creating a new damages remedy. See Egbert, 596 U.S. at 492 (citation and internal quotation marks omitted). If "there is any rational reason (even one) to think that Congress is

better suited to 'weigh the costs and benefits of allowing a damages action to proceed[,]'" then the Court cannot imply a cause of action for damages under <u>Bivens</u>.  <u>See id.</u> at 496 (emphasis in original) (citation and internal quotation marks omitted).

Here, the Court finds that there are several special factors that weigh against extending a <u>Bivens</u> remedy to Plaintiff's claim for alleged violations of his Eighth Amendment rights.  First, an alternative remedial mechanism exists for Plaintiff, which "independently foreclose[s] a <u>Bivens</u> action here."  <u>See</u> <u>Egbert</u>, 596 U.S. at 497.  More specifically, the BOP's Administrative Remedy Program, which allows federal inmates to seek review of an issue related to "any aspect" of their confinement, provides an alternative process for addressing Plaintiff's claim. <u>See</u> 28 C.F.R. § 542.10(a) (providing that "[t]he purpose of the Administrative Remedy Program is to allow an inmate to seek formal review of an issue relating to any aspect of his/her own confinement"); <u>see also</u> <u>Malesko</u>, 534 U.S. at 68 (holding that "administrative review mechanisms" can provide "meaningful redress and thereby forelose[ ] the need to fashion a new, judicially crafted cause of action[,]" even if those mechanisms do not "fully remedy the constitutional violation . . . "); <u>Egbert</u>, 596 U.S. 497 (explaining that "court[s] may not fashion a <u>Bivens</u> remedy if Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure" and that, "[i]f there are alternative remedial structures in place, that alone, like any special factor, is reason enough to limit the power of the Judiciary to infer a new <u>Bivens</u> cause of action" (citation and internal citations and quotation marks omitted)). Accordingly, "when alternative methods of relief are available," as they are here, "a <u>Bivens</u> remedy usually is not."  <u>See</u> <u>Abbasi</u>, 582 U.S. at 145.

Second, "the Judiciary is not undoubtedly better positioned than Congress to authorize a damages action" in the context of medical care in federal prisons.  <u>See</u> <u>Egbert</u>, 596 U.S. 492.

27

The Supreme Court has generally acknowledged that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform[,]" that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the <u>legislative</u> and <u>executive</u> branches of government[,]" and that this "task that has been committed to the responsibility of <u>those</u> branches, and separation of powers concerns counsel a policy of judicial restraint." <u>See</u> <u>Turner v. Safley</u>, 482 U.S. 78, 84–85 (1987) (emphasis added) (internal citation and internal quotation marks omitted). Thus, extending a <u>Bivens</u> remedy to this new context "would step well into the lawmaking privilege delegated only to Congress, and well over the bounds of [the Court's] limited constitutional power." <u>See</u> <u>Mammana v. Barben</u>, 856 F. App'x 411, 415 (3d Cir. 2021) (unpublished) (setting forth this principle in the context of a <u>Bivens</u> claim based upon allegedly unconstitutional conditions of confinement in violation of the Eighth Amendment).

Third, Congress's enactment of the Prison Litigation Reform Act ("PLRA") advises hesitation in extending <u>Bivens</u> to Plaintiff's claims. Indeed, "[s]ome 15 years after <u>Carlson</u> was decided, Congress passed the [PLRA], which made comprehensive changes to the way prisoner abuse claims must be brought in federal court." <u>See</u> <u>Abbasi</u>, 582 U.S. at 148 (citing 42 U.S.C. § 1997). As a result, Congress "had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs[,]" but deliberately chose to "not provide for a standalone damages remedy against federal jailers." <u>See</u> <u>id.</u> at 149. This legislative action, which "suggest[s] that Congress does not want a damages remedy[,] is itself a factor counseling hesitation" against extending a <u>Bivens</u> remedy to Plaintiff's case. <u>See</u> <u>id.</u> at 148; <u>see also</u> <u>Davis</u>, 962 F.3d at 112 (stating that "Congress's post-<u>Bivens</u> promulgation of the [PLRA]" suggests that Congress does not want a damages remedy).

In addition to all of these special factors, the Court must follow the reasoning of Abbasi that "[i]t is not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation, with all of its burdens on some and benefits to others." See Abbasi, 582 U.S. at 136. Indeed, while "[i]t is true that, if equitable remedies prove insufficient, a damages remedy might be necessary to redress past harm and deter future violations[,] the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide." See id. Such an assessment "include[s] the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies." See id. These concepts "may make it less probable that Congress would want the Judiciary to entertain a damages suit in a given case." See id. at 136–37.

Accordingly, for all of these reasons, the Court concludes that special factors counsel hesitation in extending a Bivens remedy to Plaintiff's claim for violations of his Eighth Amendment rights. See Egbert, 596 U.S. at 496 (stating that, if "there is any rational reason (even one) to think that Congress is better suited to 'weigh the costs and benefits of allowing a damages action to proceed[,]'" then the court cannot imply a cause of action for damages under Bivens (emphasis in original) (citation and internal quotation marks omitted)).

### c.      Summary Conclusion as to Plaintiff's Bivens Claim

Based upon the foregoing discussion, the Court concludes that, under part one of the requisite analysis, Plaintiff's Eighth Amendment claim presents a new Bivens context, and, under part two of that analysis, there are several reasons why a Bivens remedy should not extend

to this new context.  Accordingly, the Court will grant Defendants' motion to dismiss Plaintiff's Bivens claim under Rule 12(b)(1) for lack of subject matter jurisdiction.  See Long, 903 F.3d at 320 (providing that, when a court rules on a factual attack to subject matter jurisdiction under Rule 12(b)(1), "the court need not treat the allegations as true"); Gould, 220 F.3d at 176 (stating that, "[i]n reviewing a factual attack, the court may consider evidence outside the pleadings" (citation omitted)).  In light of this ruling, the Court need not reach Defendants' alternative arguments that the individual Defendants are entitled to qualified immunity on Plaintiff's Bivens' claim or that Plaintiff failed to administratively exhaust his Bivens claim as it relates to Defendant Finley.  (Doc. No. 25 at 30–34, 49–62.)

### 2.     Plaintiff's Motion to Strike and Supporting Declaration Regarding His Bivens Claim

In his motion to strike, Plaintiff argues that Defendants' motion to dismiss and/or motion for summary judgment is premature because he has not been afforded the opportunity to conduct discovery and because this case requires discovery for "a number of pertinent and material issues."  (Doc. No. 31 at 1.)  In support, Plaintiff appears to set forth only two (2) examples: (1) Defendant Finley's alleged "involvement in implementing pandemic mitigation strategies that made it impossible for medical services staff to properly examine inmates' medical complaints is highly material in that it goes right to whether he exhibited deliberate indifference when issuing those orders[;]"[4] and (2) while the medical records produced by Defendants suggest that, during his March 2, 2020 evaluation with Defendant Mace-Leibson, he denied having any pain or

---

[4]  Plaintiff's reference to the "pandemic" is a reference to the COVID-19 pandemic during the time relevant to his complaint.  And, in this regard, the Court notes that Plaintiff's complaint contains allegations (and Defendants' statement of material facts include averments) which suggest that, during the COVID-19 pandemic, some medical appointments were conducted by medical staff while inmates remained in their cells.  See, e.g., (Doc. Nos. 1 ¶ 13; 24 ¶ 36).

history of pain and reported that he was exercising regularly and doing deadlifts, his complaint alleges differently—that is, he informed Defendant Mace-Leibson that he was in pain and had swelling in his left shoulder.  (Id.)  In addition to these two (2) cited examples, Plaintiff also generally contends that defense counsel has relied entirely on Plaintiff's medical records and that the "[w]e don't know how accurate they are."  (Id.)

In his supporting declaration, which is contained within his motion to strike, Plaintiff asserts that he seeks to conduct discovery on the following issues:[5]

1.     The pandemic's effect on BOP operations;

2.     Defendant Finley's response to the pandemic with respect to medical care services rendered to inmates at FCI Schuylkill;

3.     The procedures employed by FCI Schuylkill staff during the pandemic;

4.     Defendant Mace-Leibson's recollection of events surrounding the basis for Plaintiff's claims against her, including the procedures she employed to draft her physician encounter notes;

5.     The veracity of the BOP's medical records;

6.     Defendant Finley's procedures for investigating inmates' administrative remedies at FCI Schuylkill;

7.     The pandemic's effect on the decision-making process surrounding medical care for inmates;

8.     Whether Defendants Finley and Mace-Leibson were responsible for issuing orders to staff prohibiting the opening of cell doors during medical encounters;

9.     The "rate" of complaints for delays and deprivations of medical care, "as a whole[,]" at FCI Schuylkill before, during, and after the pandemic;

10.    Defendant Finley's rate of granting administrative remedies for complaints concerning medical care before, during, and after the pandemic;

---

[5] The Court recounts Plaintiff's list, as it is set forth in his declaration.  However, the Court does so in a more summary fashion.

11.     Defendant Mace-Leibson's background, character, and fitness as a medical doctor;

12.     Defendant Mace-Leibson's medical conclusion that Plaintiff's condition was only cosmetic;

13.     Defendant Mace-Leibson's alleged claims that she provided education materials and a treatment plan to Plaintiff; and

14.     Any other discoverable material that may arise during the ordinary course of discovery.

(Doc. No. 31 at 2–3.)

Plaintiff's point that the parties have not yet engaged in discovery is well-taken.  That said, although the Court recognizes that motions for summary judgment are not typically filed until discovery has been completed, under certain circumstances, motions for summary judgment may be filed prior to the completion of discovery.  See Fed. R. Civ. P. 56(b) (stating that "[u]nless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery" (emphasis added)).

If, however, the non-moving party files an "affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may[:]" defer a ruling on the motion for summary judgment or deny it; allow time for the non-moving party to obtain affidavits, declarations, or take discovery; or issue any other appropriate order.  See Fed. R. Civ. P. 54(d); Shelton v. Bledsoe, 775 F.3d 554, 567 (3d Cir. 2015).  "[D]istrict courts usually grant properly filed requests for discovery under Rule 56(d) 'as a matter of course,'" and "[t]his is particularly true when there are discovery requests outstanding or where relevant facts are under control of the party moving for summary judgment."  See id. at 568 (citation and internal

citations omitted).  Thus, "[i]f discovery is incomplete, a district court is rarely justified in granting summary judgment[.]"  See id.

However, there are exceptions to this general rule.  If "the discovery request pertains to facts that are not material to the moving party's entitlement to judgment as a matter of law[,]" then granting summary judgment may be justified.  See id.  In addition, if "the Rule 56(d) declaration is inadequate[,]" then granting summary judgment may also be justified.  See id.  The Third Circuit has explained that a Rule 56(d) declaration is adequate where it "specifies what particular information that is sought; how, if disclosed, it would preclude summary judgment; and why it has not been previously obtained."  See id. (citation and internal quotation marks omitted).

Here, the Court finds that Plaintiff's Rule 56(d) declaration is inadequate to overcome Defendants' motion to dismiss and/or motion for summary judgment.  While Plaintiff's declaration sets forth numerous areas of inquiry for discovery, Plaintiff's declaration does not describe what information or material facts he would present to oppose Defendants' motion or how that information or those material facts would preclude dismissal of his Bivens claim for lack of subject matter jurisdiction.  In addition, to the extent that Plaintiff's motion to strike and supporting declaration attempt to dispute (1) the alleged COVID-19 mitigation strategies that Defendant Finley put into effect during the pandemic or (2) what Plaintiff said to Defendant Mace-Leibson during a single medical encounter on March 2, 2020 (Doc. No. 31 at 1), the Court finds that these disputes do not implicate material facts that would change the ultimate outcome of the Court's conclusion concerning his Bivens claim.[6]

---

[6]  Even assuming arguendo that Plaintiff could show that he was suffering from pain in March of 2020, such non-fatal pain stemming from a benign mass of fatty tissue, for which Plaintiff went to the hospital and received surgery and follow-up care, is markedly different from Carlson,

Indeed, the question before the Court, as it relates to Plaintiff's <u>Bivens</u> claim, is not simply whether Defendants were deliberately indifferent to his serious medical needs, but whether the factual and legal circumstances of his case arise in a new <u>Bivens</u> context and, if so, whether any special factors counsel against extending a <u>Bivens</u> remedy to that new context.  For all of the reasons discussed above, the Court concludes that Plaintiff's Eighth Amendment claim presents a new <u>Bivens</u> context and that special factors counsel hesitation in extending a <u>Bivens</u> remedy to this case.  In connection with this conclusion, the Court finds that the discovery Plaintiff seeks in his declaration would not require the Court to alter its conclusion as to his <u>Bivens</u> claim.  As a result, the Court will deny, in part, Plaintiff's motion to strike Defendants' motion to dismiss and/or motion for summary judgment.[7]

### 3.    Plaintiff's FTCA Claims

In addition to his <u>Bivens</u> claim, Plaintiff asserts the following four (4) claims against Defendant United States under the FTCA: (1) ordinary negligence; (2) medical negligence (<u>i.e.</u>, medical malpractice); (3) failure to supervise; and (4) negligent infliction of emotional distress. (Doc. No. 1 at 16–18.)  Defendants argue that each of Plaintiff's FTCA claims should be dismissed because (1) he failed to properly exhaust the failure to supervise claim and (2) because

---

where—as discussed above—a prisoner died after federal prison officials allegedly kept him in a grossly inadequate medical facility against the advice of doctors, failed to give him competent care for some eight (8) hours after he suffered an asthmatic attack, administered contraindicated drugs that made the prisoner's asthmatic attack more severe, attempted to use a respirator known to be inoperative which only further impeded the prisoner's breathing, and unjustifiably delayed transferring the prisoner to a hospital.  And, further, even assuming <u>arguendo</u> that Plaintiff could show that there was any interference with his access to medical care because of COVID-19 mitigation strategies that Defendant Finley implemented during the pandemic, such circumstances only buttress the Court's conclusion that Plaintiff's case presents a new context and, thus, seeks to extend <u>Bivens</u> and, more specifically, <u>Carlson.</u>

[7]  As discussed below, the Court will grant, in part, Plaintiff's motion to strike to the extent that he seeks time to conduct discovery on his ordinary negligence, medical negligence, and negligent infliction of emotional distress claims under the FTCA.

his complaint fails to state a plausible claim for relief as to his ordinary negligence, medical negligence, and failure to supervise claims.  (Doc. No. 25 at 62–74.)  Alternatively, the United States argues that it is entitled to summary judgment in its favor on all of Plaintiff's FTCA claims.  (Id. at 74–76.)

Generally speaking, "[t]he United States, 'as a sovereign, is immune from suit unless it consents to be sued.'"  See S.R.P. ex rel. Abunabba v. United States, 676 F.3d 329, 332 (3d Cir. 2012) ("Abunabba") (quoting Merando v. United States, 517 F.3d 160, 164 (3d Cir. 2008)).  The FTCA, however, authorizes suits against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  See 28 U.S.C. § 1346(b)(1).

Accordingly, "[t]he FTCA is a 'partial abrogation'" of the United States' sovereign immunity, see Abunabba, 676 F.3d at 332 (quoting Gotha v. United States, 115 F.3d 176, 179 (3rd Cir. 1997)), because it authorizes suits against the United States for such negligent or wrongful acts or omissions of federal employees while acting within the scope of their employment.  See 28 U.S.C. § 1346(b)(1); Rinaldi v. United States, 904 F.3d 257, 273 (3d Cir. 2018) (stating that "[t]he FTCA offers a limited waiver of the federal government's sovereign immunity from civil liability for negligent acts of government employees acting within the scope of their employment" (citations omitted)).

As explained by the Supreme Court, in order to state a claim under the FTCA, a plaintiff must plausibly allege the following six (6) elements of 28 U.S.C. § 1346(b):

> "'[1] [a claim] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent

> or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'"

See Brownback v. King, 592 U.S. 209, 212 (2021) (quoting FDIC v. Meyer, 510 U.S. 471, 477 (1994) (quoting 28 U.S.C. § 1346(b))).

In addition, and as also set forth by the FTCA, a plaintiff must present his administrative claim "to the appropriate Federal agency[,]" and receive a final decision on the claim, before filing suit against the United States. See 28 U.S.C. § 2675(a) (providing that "[a]n action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail" (emphasis added)); see also Simmons v. Himmelreich, 578 U.S. 621, 625 (2016) (referring to 28 U.S.C. § 2675(a) as the "exhaustion requirement").

If a plaintiff does not comply with this exhaustion requirement before filing his FTCA suit, the United States' sovereign immunity has not been waived and subject-matter jurisdiction is, therefore, lacking. See, e.g., Shelton, 775 F.3d at 569 (explaining that no FTCA claim can be initiated unless the plaintiff first presents that claim to the appropriate agency, and the agency renders a final decision on the claim, and stating that this requirement "is jurisdictional[,]" and it "cannot be waived" (citation omitted)); Roma v. United States, 344 F.3d 352, 362 (3d Cir. 2003) (explaining that this exhaustion requirement "is jurisdictional and cannot be waived" (citation omitted)); Bialowas v. United States, 443 F.2d 1047, 1049 (3d Cir. 1971) (stating that the FTCA "requires an initial presentation" of the administrative claim to the appropriate agency, as well as

36

a final denial by that agency, in order to file suit under the FTCA and recognizing that this "requirement is jurisdictional and cannot be waived" (citation omitted)).

"Although an administrative claim need not propound every possible theory of liability in order to satisfy section 2675(a), . . . a plaintiff cannot present one claim to the agency and then maintain suit on the basis of a different set of facts." See Roma, 344 F.3d at 362 (citation and internal quotation marks omitted). Thus, in order for a plaintiff to properly present his claim to the appropriate Federal agency, he must "(1) give[ ] the agency written notice of [the] claim sufficient to enable the agency to investigate and (2) places a value on [the] claim." See Tucker v. U.S. Postal Service, 676 F.2d 954, 959 (3d Cir. 1982) (citations omitted); accord Roma, 344 F.3d at 362–63. "This requisite minimal notice . . . promptly informs the relevant agency of the circumstances of the accident so that it may investigate the claim and respond either by settlement or by defense." See Tucker, 676 F.2d at 958. And prompt settlement, of course, "provides considerable benefits to both the courts and the parties by avoiding costly litigation and compensating the injured party in a timely manner." See White-Squire v. U.S. Postal Serv., 592 F.3d 453, 459 (3d Cir. 2010) (citations omitted).

### a.   Plaintiff's Failure to Exhaust His Failure to Supervise Claim

Plaintiff's complaint asserts a failure to supervise claim against Defendants Conners and Finley concerning their involvement with the FTCA's administrative remedy procedure. (Doc. No. 1 at 17 (alleging, inter alia, that these Defendants were aware of Defendant United States' policies which directed them to independently investigate administrative remedies, that they were also aware that their failure to investigate such remedies could lead to constitutional

violations, and that their failure to utilize Defendant United States' procedures resulted in physical and emotional injuries to Plaintiff).)[8]

The undisputed material facts reflect, however, that Plaintiff submitted one administrative tort claim to the BOP for consideration (Doc. No. 24 ¶¶ 107–12) and that this administrative tort claim concerned only the alleged negligence of BOP staff in failing to properly treat his lipoma, which caused him to suffer from severe pain and permanent damage (id. ¶¶ 109, 112).  In other words, neither Plaintiff's original "Standard Form 95, Claim for Damage, Injury, or Death" ("SF-95"), nor his amended SF-95, alleged any form of failure to supervise by Defendants Conners and Finley.  (Doc. No. 24-2 at 419, 426.)  In light of Plaintiff's failure, the Court finds that the Third Circuit's decision in Roma is instructive here.

In Roma, firefighter Mark Roma ("Roma") suffered smoke-inhalation injuries while fighting a hanger fire at the Naval Air Engineering Station in Lakehurst, New Jersey ("NAES"), after a NAES firefighter instructed Roma to remove his breathing apparatus while fighting the fire.  See Roma, 344 F.3d at 354, 356.  Roma subsequently submitted a SF-95 to the Navy, seeking damages for injuries he suffered as a result of fighting the fire.  See id. at 358.  He described his administrative claim as follows: "During fire emergency[,] claimant was ordered to remove breathing respirator. As a result of same, claimant sustained significant damage to his respitory [sic] system."  See id. (explaining that Roma filed a second or an amended SF-95,

---

[8]  From what the Court can discern, the section of Plaintiff's complaint that discusses his failure to supervise claim conflates the BOP's grievance procedure that is available for redress of constitutional violations and the FTCA's administrative remedy procedure that is available for redress of tort claims.  (Doc. No. 1 at 17); see also (Doc. No. 24 at ¶¶ 8–26, 107–15 (containing Defendants' statement of material facts, which distinguish between Plaintiff's administrative remedies for his constitutional claim and his administrative remedies for his tort claims)).  Thus, the Court notes that it has construed the allegations in Plaintiff's complaint liberally and in the light most favorable to him.

which included a specified damages amount, but did not change the basis for his administrative claim).  However, when Roma filed his FTCA complaint in federal court, he asserted two (2) separate claims: (1) the federal defendants were liable for his injuries because they negligently instructed him to remove his breathing apparatus during the fire; and (2) federal defendants and the civilian contractors were liable for negligently starting the fire or for failing to prevent it.  See id. at 355.  Although Roma argued that his administrative claim to the Navy gave the United States adequate notice to investigate the potential negligence of the federal employees' failure to prevent the fire, the Third Circuit disagreed, finding that "[t]he facts concerning how the fire started and any negligence by federal employees in failing to prevent it are entirely distinct from the conduct involved in supervising the firefighting operations, including the NAES . . . firefighter's instruction to Roma to remove his [breathing apparatus]."  See id. at 363.  As a result, Roma's SF-95 "did not provide any notice to the United States that it not only had to investigate the way the firefighting was handled by federal employees, but that it also had to engage in a much broader investigation concerning whether the negligence of other, non-firefighter, federal employees may have contributed to the start of the fire itself."  See id.

Applying Roma to this case, the Court concludes that, because Plaintiff's failure to supervise claim concerning the BOP employees' alleged failure to follow policies and procedures governing the administrative remedy process is entirely distinct from and much broader than Plaintiff's negligence claim concerning the BOP employees' alleged failure to provide adequate medical care to Plaintiff for his lipoma, the Court concludes that Plaintiff did not properly present his failure to supervise claim to the BOP and, thus, did not comply with the FTCA's exhaustion requirement before asserting his failure to supervise claim against Defendant United States in federal court.

As a result, Defendant United States' sovereign immunity has not been waived and subject-matter jurisdiction is, therefore, lacking.  See, e.g., Shelton, 775 F.3d at 569 (explaining that no FTCA claim can be initiated unless the plaintiff first presents that claim to the appropriate agency, and the agency renders a final decision on the claim, and stating that this requirement "is jurisdictional[,]" and it "cannot be waived" (citation omitted)).  Accordingly, the Court will grant Defendants' motion under Rule 12(b)(1) and dismiss Plaintiff's FTCA failure to supervise claim for lack of subject matter jurisdiction.

> **b.  Plaintiff's Ordinary Negligence, Medical Negligence, and Negligent Infliction of Emotional Distress Claims**

> **i.  Plaintiff's Ordinary and Medical Negligence Claims**

In order for a plaintiff to prevail on a medical negligence (i.e., medical malpractice) claim under Pennsylvania law, "the plaintiff must prove that the defendant's treatment fell below the appropriate standard of care."  See Brady v. Urbas, 111 A.3d 1155, 1161 (Pa. 2015) (citations omitted); Toogood v. Rogal, 824 A.2d 1140, 1145 (Pa. 2003) (stating that "medical malpractice can be broadly defined as the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient . . . ").  "[W]hen a plaintiff's medical malpractice claim sounds in negligence, the elements of the plaintiff's case are the same as those in ordinary negligence actions."  Id.; accord Ditch v. Waynesboro Hosp., 917 A.2d 317, 322 (Pa. Super. Ct. 2007), aff'd, 17 A.3d 310 (Pa. 2011), (providing that "the basic elements of medical malpractice and ordinary negligence are the same . . . " (citation omitted)).

Thus, in order to state a prima facie case for ordinary and medical negligence claims, a plaintiff must establish: (1) a duty of care owed by the physician to the patient; (2) a breach of that duty; (3) the breach of that duty was the proximate cause of the harm suffered by the patient; and (4) the damages suffered were a direct result of that harm.  See Mitchell v. Shikora, 209

A.3d 307, 314 (Pa. 2019) (citing <u>Hightower-Warren v. Silk</u>, 698 A.2d 52, 54 (Pa. 1997)).  Put another way, "to prevail on a claim of medical negligence, the plaintiff must prove, inter alia, that the defendant's treatment fell below the appropriate standard of care—that is, varied from accepted medical practice."  <u>See</u> <u>Mitchell</u>, 209 A.3d at 314–15.

As "[w]ith all but the most self-evident medical malpractice actions[,] there is also the added requirement that the plaintiff must provide a medical expert who will testify as to the elements of duty, breach, and causation."  <u>See</u> <u>Quinby v. Plumsteadville Fam. Prac., Inc.</u>, 907 A.2d 1061, 1070–71 (Pa. 2006) (citation omitted); <u>accord</u> <u>Mitchell</u>, 209 A.3d at 315 (providing that a "plaintiff in a medical negligence matter is required to present an expert witness who will testify, to a reasonable degree of medical certainty, regarding the standard of care (duty); that the acts of the physician deviated from the standard or care (breach); and that such deviation was the proximate cause of the harm suffered" (citation omitted)).  As explained by the Pennsylvania Supreme Court, "[a]xpert testimony in support of the plaintiff's claim is an indispensable requirement in establishing a plaintiff's right of action, as the treatment and injury typically involved are such that the common knowledge or experience of a layperson is insufficient to form the basis for passing judgment."  <u>See</u> <u>id.</u> (citation omitted).

Here, Defendants argue that Plaintiff's complaint fails to allege a breach of the standard of care and causation for his ordinary and medical negligence claims.  (Doc. No. 25 at 68–73.)  The Court disagrees and finds that Plaintiff's complaint addresses all four (4) elements of his negligence claims.  As for duty of care, Plaintiff's complaint alleges that Defendant United States, via its BOP employees, were responsible for his medical care and had a duty to provide him with reasonable medical care, including, but not limited to, conducting physical examinations of him in order to properly evaluate his condition and render a clinical diagnosis.

41

(Doc. No. 1 at 17.)  With respect to breach, Plaintiff's complaint alleges that Defendant United States breached that duty of care by conducting examinations of inmates through cell doors during periods of the COVID-19 pandemic and by not referring Plaintiff (any sooner) to a physician who could conduct such a physical examination of him.  (Id. at 17–18.)  Regarding causation and damages, Plaintiff's complaint asserts that this allegedly inadequate medical care caused him unnecessary pain and suffering and that he continues to endure pain and numbness on the left side of his upper body.  (Id. at 17.)  Based upon these allegations, the Court finds that Plaintiff's complaint plausibly states ordinary and medical negligence claims against Defendant United States.  As a result, the Court will deny Defendants' motion to dismiss these claims under Rule 12(b)(6).

### ii.   Plaintiff's Negligent Infliction of Emotional Distress Claim

In his complaint, Plaintiff asserts a negligent infliction of emotional distress claim against Defendant United States.  (Doc. No. 1 at 16–17.)  As discussed above, a negligence claim under Pennsylvania law "requires a showing of four elements: (1) the defendant had a duty to conform to a certain standard of conduct; (2) the defendant breached that duty; (3) such breach caused the injury in question; and (4) the plaintiff incurred actual loss or damage."  See Pyeritz v. Com., 32 A.3d 687, 692 (Pa. 2011) (citation omitted).  "[A]bsent a finding of negligence, [a] negligent infliction of emotional distress claim cannot survive."  Jordan v. Pennsylvania State Univ., 276 A.3d 751, 774 (Pa. Super. Ct. 2022) (citation and internal quotation marks omitted).  In other words, a plaintiff must establish a negligence claim in order to prevail under any theory of a negligent infliction of emotional distress claim.  See id.  As discussed above, Plaintiff's complaint has successfully hurdled this preliminary issue.

In addition to having to allege an underlying negligence claim, a negligent infliction of emotional distress claim is limited to the following four (4) theories of recovery under Pennsylvania law: "(1) situations where the defendant owed the plaintiff a pre-existing contractual or fiduciary duty (the special relationship rule); (2) the plaintiff suffered a physical impact (the impact rule); (3) the plaintiff was in a zone of danger and reasonably experienced a fear of immediate physical injury (the zone of danger rule); or (4) the plaintiff observed a tortious injury to a close relative (the bystander rule)." See id. at 774 (citation and internal quotation marks omitted)); Toney v. Chester County Hosp., 961 A.2d 192, 197–98 (Pa. Super. Ct. 2008), aff'd, 36 A.3d 83 (Pa. 2011), (recognizing these same four elements (citation omitted)).

Here, Defendants argue that, even if the Court determines that Plaintiff's complaint states claims for ordinary and medical negligence, his claim for negligent infliction of emotional distress ("NIED") claim is still legally deficient.  (Doc. No. 25 at 73–74.)  In support, Defendants argue that Plaintiff's complaint has not alleged any facts supporting any of the four (4) potential theories of liability for NIED.  (Id. at 73.)  At most, Defendants argue, Plaintiff's complaint baldly claims that Defendants United States and Mace-Leibson had a "fiduciary duty" to provide him adequate medical care.  (Id. at 74 (citing Doc. No. 1 at 17).)  The Court disagrees with Defendants and finds that Plaintiff's complaint adequately alleges this NIED theory of liability.

More specifically, Plaintiff's complaint alleges that Defendant United States, via BOP employees, owed Plaintiff a fiduciary duty and that Defendant United States breached that fiduciary duty, which resulted in injury to him.  (Doc. No. 1 at 17.)  Under Pennsylvania law, a plaintiff may proceed on a "fiduciary duty" theory of liability, as follows:

> if an actor has a particular contractual or fiduciary relationship with a victim and it is foreseeable that the actor's carelessness could cause severe emotional harm

43

to the victim, and that harm occurs, a cognizable tort arises which is, in short-form, referred to as a breach of a "contractual or fiduciary duty" not to inflict foreseeable emotional distress upon a victim.

See Toney v. Chester County Hosp., 36 A.3d 83, 84 n.1 (Pa. 2011).  In Toney, the Pennsylvania

Supreme Court further explained that the reach of this cause of action is limited to:

> preexisting relationships involving duties that obviously and objectively hold the potential of deep emotional harm in the event of breach . . . . [T]he special relationships must encompass an implied duty to care for the plaintiff's emotional well-being . . . . Compensable emotional harm has been described as likely to be experienced as a visceral and devastating assault on the self" such that it resemble[s] physical agony in its brutality . . . . [R]elationships involving life and death fall within this category. It is impossible, and indeed would be irresponsible on our part, to create an exhaustive list of qualifying relationships in this opinion. Rather, we find it prudent to leave the legal question of whether a sufficient duty exists to our trial judges to decide on a case-by-case basis, at some point prior to trial, be it preliminary objections, summary judgment, or the like. Nonetheless, we would hold that some relationships, including some doctor-patient relationships, will involve an implied duty to care for the plaintiff's emotional well-being that, if breached, has the potential to cause emotional distress resulting in physical harm.

See Toney, 36 A.3d at 95 (citation, internal quotation marks, and internal footnote omitted).

Here, Plaintiff's complaint has pointed to the special relationship of doctor-patient.  (Doc. No. 1 at 17, 18); see also Weiley v. Albert Einstein Med. Ctr., 51 A.3d 202, 217 (Pa. Super. Ct. 2012) (acknowledging that a plaintiff can plead the existence of a duty owed to him by virtue of a "heightened fiduciary relationship[,]" such as a "particular physician-patient relationship . . . ").  In addition, the BOP has imposed upon it a federal statutory duty to care for and keep safe all federal prisoners within its custody.  See 18 U.S.C. § 4042(a).  Thus, in light of these legal principles and Defendants' failure to cite to any binding authority which would suggest that a fiduciary relationship cannot exist under the circumstances alleged here (Doc. No. 25 at 73–74), the Court will deny their motion to dismiss Plaintiff's negligent infliction of emotional distress claim under Rule 12(b)(6).

44

c.      **Summary Judgment as to Plaintiff's Ordinary Negligence,
Medical Negligence, and NIED Claims**

Alternatively, Defendants argue that, with respect to Plaintiff's claims of ordinary

negligence, medical negligence, and NIED, Defendant United States is entitled to summary

judgment because Plaintiff cannot demonstrate a prima facie case under either theory of

negligence, and, thus, his NIED claim necessarily fails as a matter of law.  (Doc. No. 25 at 74.)

In support of their argument, Defendants assert that Plaintiff cannot establish that BOP medical

staff breached their duty to provide him care.  (Id.)  In further support of their argument,

Defendants point to the summary judgment record in this matter, which is largely comprised of

Plaintiff's medical records (id. at 74–76), in order to argue that those medical records

demonstrate that Plaintiff "received continuous and appropriate medical care for his trapezius

muscle pain and lipoma" (id. at 74).

While it is evident, based upon Plaintiff's medical records, that he "received" medical

attention for his left trapezius/shoulder/neck area, there is a sharp dispute as to whether such

attention was professionally "appropriate" under the circumstances.  Indeed, as set forth above,

Plaintiff's complaint alleges that: Defendant United States was responsible for his medical care

and that it had a duty to provide him with reasonable medical care; Defendant United States, via

its BOP employees, breached that duty of care by not conducting a physical examination of

Plaintiff in order to properly assess his left trapezius and by not sending him to a specialist any

sooner so that such an examination could be conducted on him; and as a result of this breach,

Plaintiff suffered from unnecessary pain and emotional distress and continues to suffer from such

pain and numbness to the left side of his upper body.  In light of these sufficient allegations, the

Court observes that Plaintiff has not been afforded time to conduct discovery in this matter or to

develop any support for his ordinary negligence, medical negligence, and NIED claims.  The

Court will exercise caution here and refrain from ruling on Defendants' summary judgment arguments at this time.

Accordingly, the Court will grant, in part, Plaintiff's motion to strike to the limited extent that he seeks the opportunity to conduct discovery on his tort claims. In light of this ruling, the Court will deny Defendants' motion to dismiss and/or motion for summary judgment to the extent that Defendants seek summary judgment under Rule 56 on Plaintiff's tort claims. Defendants are free, of course, to reassert these arguments following the discovery period in this matter.

**B.    Leave to Amend**

The Court briefly addresses whether Plaintiff should be granted leave to amend his complaint. Due to the applicable liberal pleading standard, a plaintiff should generally be granted leave to amend before a Court dismisses a claim that is merely deficient. See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002). The Federal Rules of Civil Procedure allow for amendments to be granted liberally in light of the "principle that the purpose of pleading is to facilitate a proper decision on the merits." See Foman, 371 U.S. at 182 (citation and internal quotation marks omitted). However, the Court may deny leave to amend where there is "undue delay, bad faith[,] or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment[.]" See id.

In accordance with this standard, the Court finds that granting Plaintiff leave to amend would be futile here. No amendment could remedy the deficiencies discussed above with respect to Plaintiff's Eighth Amendment Bivens claim. Thus, the Court will deny Plaintiff leave to

amend, but will permit him to proceed on his ordinary negligence, medical negligence, and NIED claims under the FTCA against Defendants.[9]

## IV.    CONCLUSION

For the reasons set forth above, the Court will grant in part and deny in part Defendants' motion to dismiss and/or motion for summary judgment.  (Doc. No. 19.)  In addition, the Court will grant in part and deny in part Plaintiff's motion to strike and supporting declaration.  (Doc. No. 31.)  An appropriate Order follows.


s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

---

[9]  Although Plaintiff discusses an individual by the name of "English" in his complaint (Doc. No. 1 at 17), Plaintiff has not named this individual as a Defendant in the caption of his complaint or in the "The Defendant(s)" section in the body of his complaint (id. at 1–3).  To the extent that Plaintiff would seek leave to amend his complaint in order to name this individual as a Defendant, the Court notes that Plaintiff's complaint only asserts a failure to supervise claim against English in his complaint (id. at 17), and, thus, any amendment would be futile because, as discussed above, Plaintiff failed to exhaust his failure to supervise claim before asserting this claim against Defendant United States in federal court.

47