**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

NATHANIEL ORTIZ,                            :
      Plaintiff                            :      No. 1:23-cv-00203
                          :
      v.                                      :      (Judge Kane)
                          :
UNITED STATES OF AMERICA, <u>et</u> <u>al.</u>,   :
      Defendants                           :

**<u>MEMORANDUM</u>**

Currently before the Court is Defendant United States of America (the "Government")'s motion for summary judgment on pro se Plaintiff Nathaniel Ortiz ("Ortiz")'s remaining state-law claims under the Federal Tort Claims Act ("FTCA"). For the reasons stated below, the Court will grant the Government's motion, direct the Clerk of Court to enter judgment in its favor and against Ortiz on Ortiz's remaining FTCA claims, and close this case.

**I.      BACKGROUND**

**A.      Procedural History**

Ortiz is a convicted and sentenced federal prisoner currently in the custody of the Federal Bureau of Prisons ("BOP") at Federal Correctional Institution Gilmer in West Virginia. See (Doc. Nos. 1 at 2, 4; 56 at 1). On February 3, 2023, while Ortiz was incarcerated at Federal Correctional Institution Fort Dix ("FCI Fort Dix") in New Jersey, he commenced the instant action by filing a pro se complaint raising state-law claims for failure to supervise, ordinary negligence, medical malpractice, and negligent infliction of emotional distress ("NIED") under the FTCA as well as Eighth Amendment claims under <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971) for deliberate indifference to his serious medical needs, all of which related to allegedly inadequate medical care he received while incarcerated at Federal Correctional Institution Schuylkill ("FCI Schuylkill") from early 2020

through the middle of 2021.  See (id. at 3, 6, 16–18).  Ortiz names as Defendants the Government and the following individuals, all of whom allegedly worked for the BOP during the events alleged in his complaint: (1) Ian Conners ("Conners"), a National Inmate Appeals Administrator; (2) Scott Finley ("Finley"), the Warden at FCI Schuylkill; (3) Dr. Ellen Mace-Leibson ("Dr. Mace-Leibson"), the Clinical Director at FCI Schuylkill; and (4) "John & Jane Does 1–10, XYZ Corps. 1–10, Comps. 1–10."  See (id. at 2–3).  Ortiz initially sought to proceed in forma pauperis in this case, see (Doc. Nos. 2–3, 6–7); however, he later remitted the filing fee.  See (Doc. No. 9).

On May 18, 2023, the Court issued an Order which, inter alia, (1) deemed Ortiz's complaint filed; (2) directed the Clerk of Court to issue a summons and transmit it along with a copy of the complaint to the United States Marshal for service upon the Government in accordance with Federal Rule of Civil Procedure 4(i)(1); and (3) directed the Clerk of Court to serve waiver of service forms and copies of the complaint on Conners, Finley, and Dr. Mace-Leibson.  See (Doc. No. 10 at 1).  On July 6, 2023, Defendants requested an extension of time in which to respond to Ortiz's complaint (Doc. No. 16), which the Court granted on July 10, 2023 (Doc. No. 17).

Thereafter, on August 16, 2023, Defendants filed a motion to dismiss and/or a motion for summary judgment, followed by their supporting brief, statement of material facts, and corresponding exhibits, arguing, inter alia, that the Court should dismiss Ortiz's claims for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), dismiss his claims for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), or grant summary judgment in their favor on his claims pursuant to Federal Rule of Civil Procedure 56.  See (Doc. Nos. 19, 24, 25).  On October 10, 2023, Ortiz filed a

motion for an extension of time in which to file a brief in opposition to Defendants' combined motion (Doc. No. 27), which the Court granted on October 18, 2023 (Doc. No. 28). Ortiz then timely filed his brief in opposition to Defendants' combined motion on November 2, 2023. (Doc. No. 29.) He also filed a request for entry of default against Dr. Mace-Leibson (Doc. No. 30), as well as a motion to strike Defendants' motion to dismiss and/or motion for summary judgment, which included a supporting declaration (Doc. No. 31). Following an extension of time (Doc. Nos. 32, 33), Defendants filed a reply brief addressing Ortiz's brief in opposition, as well as his motion to strike and supporting declaration (Doc. No. 34).

On April 15, 2024, the Court issued a Memorandum and Order which, inter alia: (1) granted Defendants' Rule 12(b)(1) motion to dismiss Ortiz's Eighth Amendment Bivens claims and dismissed those claims for lack of jurisdiction; (2) granted Defendants' Rule 12(b)(6) motion to dismiss Ortiz's failure-to-supervise claim under the FTCA due to his failure to exhaust his administrative remedies; (3) denied Defendants' motions as to Ortiz's negligence, medical malpractice, and NIED claims under the FTCA; (4) indicated that this case would proceed on only Ortiz's FTCA claims for negligence, medical malpractice, and NIED against the Government;[1] (5) directed the Clerk of Court to terminate Conners as a Defendant on the caption in this case; (6) granted Ortiz's motion to strike insofar as he sought to proceed to discovery on his surviving claims under the FTCA; (7) denied Ortiz's motion to strike as to his Eighth Amendment Bivens claim; and (8) established deadlines for the Government to file an answer to Ortiz's complaint, as well as for the parties to complete discovery and file dispositive motions.

---

[1] Although the Court's Order also indicated that the FTCA claims would proceed against Finley and Dr. Mace-Leibson, see (Doc. No. 36 at 1), the "Government is the only proper defendant in a case brought under the FTCA." See CNA v. United States, 535 F.3d 132, 138 n.2 (3d Cir. 2008), as amended (Sept. 29, 2008). Hereinafter, the Court will refer to the Government as the only remaining Defendant in this case.

See (Doc. Nos. 35, 36).  After seeking and receiving an extension of time (Doc. Nos. 37, 38), the Government filed an answer and affirmative defenses to Ortiz's complaint on May 8, 2024 (Doc. 39).

Ortiz filed a motion to appoint counsel on September 12, 2024.  (Doc. No. 42.)  On January 14, 2025, the Government filed its motion for summary judgment.  (Doc. No. 43.)  It later filed a statement of undisputed material facts and a supporting brief on March 7, 2025, and March 10, 2025, respectively.  (Doc. Nos. 49, 51.)

On May 5, 2025, the Court conditionally granted Ortiz's motion to appoint counsel and referred this case to Michael A. O'Donnell, Esq., Chair of the Federal Bar Association's Pro Bono Committee, to attempt to locate volunteer counsel to represent Ortiz in this case.  See (Doc. No. 53 at 6).  The Court also stayed Ortiz's deadline to respond to the Government's motion for summary judgment until Attorney O'Donnell notified the Court about whether counsel would enter their appearance on Ortiz's behalf.  See (id. at 7).

Attorney O'Donnell notified the Court that he was unable to locate counsel to represent Ortiz in this case; consequently, the Court issued an Order on September 30, 2025, which lifted the stay on Ortiz's deadline to file a response to the Government's motion for summary judgment and directed him to file his response within thirty days.  See (Doc. No. 55 at 1).  On November 17, 2025, the Court directed the Clerk of Court to resend a copy of the September 30, 2025 Order to Ortiz because it appeared that he was transferred to a different federal prison shortly after the issuance of that Order.  See (Doc. Nos. 58 at 1–2; 57 at 1).  The Court also provided Ortiz with another thirty-day period to file his response to the Government's motion for summary judgment.  See (Doc. No. 58 at 2).

4

On November 20, 2025, Ortiz filed a combined motion for an extension of time to file his response to the motion for summary judgment, and a motion seeking an Order allocating funds to him so he could hire an expert witness. (Doc. No. 59.) On the same date, the Court issued an Order denying both motions. (Doc. No. 60.)

Ortiz timely filed a response to the Government's motion for summary judgment on December 19, 2025. (Doc. No. 61.) The Government then timely filed a reply brief in further support of its motion on December 31, 2025 (Doc. No. 62), and Ortiz sought and received leave to file a sur-reply brief (Doc. Nos. 63, 65), which was docketed on February 3, 2026 (Doc. No. 64). The Government's motion for summary judgment is ripe for disposition.

**B.    Allegations in Ortiz's Complaint**

Ortiz was confined at FCI Schuylkill from "at least" January 1, 2020, until January 11, 2022. See (Doc. No. 1 ¶ 3). On or about March 1, 2020, the BOP "engaged in an unprecedented lock-down [sic] of all federal prisons in light of the then-novel Coronavirus Pandemic that was gripping the nation." See (id. ¶ 9). Ortiz alleges that due to the lockdown, the BOP "essentially ceased" certain health services, such as canceling "proper physical exams, sick call, . . . other on-site services[, and r]efferals for outside medical services," because Finley and another individual "did not want to implement a proper plan to protect these . . . services." See (id. ¶ 10). For instance, Ortiz asserts that prior to the pandemic, "an inmate complaining of acute or chronic injuries or illnesses could report to a daily sick-call where they would be triaged and a human being would determine if [they] required immediate care or could wait until a reasonably scheduled appointment could be made." See (id. ¶ 11). Following the start of the pandemic, and during the times relevant to this case, "sick call was no longer conducted by the inmate reporting to sick call[; r]ather, the inmate was required to await medical services personnel to conduct

rounds to their assigned cells." See (id. ¶ 12).  Moreover, Dr. Mace-Leibson determined that "physical exams were no longer a necessary precursor to a proper medical diagnosis." See (id.).

During the pandemic, the cells at FCI Schuylkill "remained locked at all times," and Ortiz "had no ability to seek out help for the problems he developed." See (id. ¶ 13).  In addition, when medical services personnel arrived at Ortiz's cell door, they would not open the door or conduct a physical exam. See (id.).  Instead, they would examine him by "look[ing] through the small sliver of a window" in the cell door. See (id.).

On or about March 2, 2020, Ortiz informed Dr. Mace-Leibson that he was experiencing pain and swelling in his left shoulder. See (id. ¶ 15).  Dr. Mace-Leibson told Ortiz that "there was nothing wrong and terminated the encounter." See (id.).  Then, on or about April 30, 2020, Ortiz reported to "someone whom [sic] appeared to be a nurse or other qualified medical care provider" a/k/a "Jane Doe #1", that he had "a large bump on his left shoulder" and had pain in that area. See (id.).  Jane Doe #1 instructed Ortiz to move around his arm and stretch and, after Ortiz did so, she "informed [him] that there was nothing wrong with his range of motion and concluded the visit." See (id. ¶ 16).  Jane Doe #1 never physically examined Ortiz or made an "assessment as to [his] complaint," and she reported that his complaint was "cosmetic" and did not require medical intervention by the medical staff. See (id.).

Between April 30, 2020, and May 4, 2020, Ortiz "attempted to acquire [sic] the attention of any [BOP] employee to report that his shoulder was in extreme pain and that there was a large bump there." See (id. ¶ 17).  He submitted two "electronic requests to staff requesting medical care for his shoulder." See (id.).  Since Ortiz did not receive any responses from prison officials, he then unsuccessfully pursued relief through the BOP's Administrative Remedy Program ("ARP"). See (id. ¶¶ 17–23, 26–30; Doc. Nos. 1-1–1-10).

6

While Ortiz was pursuing relief through the ARP, he reported to prison officials on or about June 16, 2020, that he was experiencing "unbearable" pain in his shoulder and required treatment.  See (Doc. No. 1 ¶ 24).  Ortiz was examined, after which he was informed that "there was indeed 'swelling' and asymmetry" to his left trapezius which was indicative of 'injury to the muscle or tendon of the shoulder.'"  See (id.).  He also was "informed to take ibuprofen that he could purchase at the commissary for the injury and to 'massage' the swelling."  See (id.).

By May 16, 2021, Ortiz's "situation became dire enough" that he was transported to a hospital's emergency room.  See (id. ¶ 30).  At the time, Ortiz was "no longer able to feel [his] fingers [in] his left hand, the mass still had not abated from his left shoulder, and he was still experiencing . . .  excruciating pain . . . [in his] shoulder area."  See (id. ¶ 30).  During his time in the emergency room, Ortiz "was given an actual physical examination by a physician," which "reveal[ed] that [his] complaints for the previous year and a half were legitimate and explained all of his symptoms."  See (id. ¶ 31).  The physician found that he "had a 'large mobile, slightly tender, soft, moveable mass oblong (approx. 10x6 cm) with possible extension or separate small mass infraclavicular . . . .'"  See (id. ¶ 32).  The physician also ordered at CT scan with contrast, which showed that Ortiz "had a large 'lipomatous mass arising in the upper back and lower neck within the superficial muscles.'"  See (id. ¶¶ 34–35).  Based on this scan, the physician "diagnosed [Ortiz] as having a lipoma (or a fatty benign tumor)[,] . . . recommended that [Ortiz] and his custodians[] consider surgical referral" as well as "pain medication as needed."  See (id. ¶ 36).

On May 24, 2021, Dr. Mace-Leibson reviewed Ortiz's emergency room records.  See (id. ¶ 37).  However, Ortiz then waited "another five months [or approximately twenty months since he first complained about his shoulder] to have the tumor removed from his body."  See (id.).

7

On October 8, 2021, a general surgeon removed the lipoma from Ortiz's "left shoulder, neck, and back areas."  See (id. ¶ 38).

Ortiz alleges that between May 26, 2021, and January 11, 2022, he raised a claim through the BOP's ARP that "he was deprived his rights under the Eighth Amendment for the epic failures that shadowed [sic] his injuries."  See (id. ¶ 40).  He did not receive administrative relief on his Eighth Amendment claim.  See (id.).  Ortiz also asserts that he exhausted claims for monetary damages under the FTCA for negligence, medical malpractice, failure to supervise and train, and NIED.  See (id. ¶ 42).

Due to "the extreme delay in providing [him with] medical care," Ortiz believes "he would not have the pain that has persisted since the surgical excision."  See (id. ¶ 39).  Ortiz asserts that he "suffered with despair, hopelessness, melancholy, stress, anxiety, nausea, headaches, nightmares, [and] depression because he had a reasonable belief that a mass was growing inside him that was cancerous and that ever [sic] passing day would lead to his death because nobody would take his complaints seriously" or "provide him with "any diagnosis and treatment."  See (id. ¶ 41).  For relief, Ortiz seeks more than $5 million in compensatory damages as well as nominal damages and declaratory relief.  See (id. at 5).

## II.     LEGAL STANDARDS

### A.      Motions for Summary Judgment

The Court must render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. See id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). A dispute of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See Anderson, 477 U.S. at 257. When determining whether there is a genuine dispute of material fact, the Court must view the facts and all reasonable inferences in favor of the nonmoving party. See id. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor.").

To avoid summary judgment, the nonmoving party may not rest on the unsubstantiated allegations of their pleadings. When the party seeking summary judgment satisfies their burden to demonstrate the absence of a genuine dispute of material fact, the burden of production shifts to the nonmoving party, who must "go beyond the pleadings" with affidavits, "depositions, answers to interrogatories, and the like" to show specific material facts giving rise to a genuine dispute. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); id. at 328 (White, J., concurring). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citation omitted). Instead, they must produce evidence to show the existence of every element essential to their case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." See Celotex Corp., 477 U.S. at 323; see also Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992) (explaining that since plaintiff had the

9

burden of proof, "he must make a showing sufficient to establish the existence of every element essential to his case" (citations omitted)).

As noted supra, when determining whether a dispute of material fact exists, the Court must consider the evidence in the light most favorable to the non-moving party. See Matsushita Elec. Indus. Co., 475 U.S. at 588 (citation omitted). In doing so, the Court must "accept the non-movant's allegations as true and resolve any conflicts in [their] favor." See White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988), abrogated on other grounds by Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." See L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that they are a pro se litigant because these rules apply with equal force to all parties. See Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 245 (3d Cir. 2013) (noting that pro se parties "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants").

Even if the Court deems the facts in the moving party's submission to be admitted due to the nonmoving party's failure to comply with Local Rule 56.1, the Court cannot simply grant the motion for summary judgment as unopposed. Instead, the Court can only grant the motion if the Court "find[s] that judgment for the moving party is 'appropriate.'" See Anchorage Assoc. v. V.I. Bd. of Tax Rev., 922 F.2d 168, 175 (3d Cir. 1990). The analysis for determining whether

judgment is "appropriate" depends on whether the party moving for summary judgment bears the "burden of proof on the relevant issues":

> Where the moving party has the burden of proof on the relevant issues, this means that the district court must determine that the facts specified in or in connection with the motion entitle the moving party to judgment as a matter of law. Where the moving party does not have the burden of proof on the relevant issues, this means that the district court must determine that the deficiencies in the opponent's evidence designated in or in connection with the motion entitle the moving party to judgment as a matter of law.

See id. (citing Celotex Corp., 477 U.S. 317).

## B.    The FTCA

Generally speaking, "[t]he United States, 'as a sovereign, is immune from suit unless it consents to be sued.'" See S.R.P. ex rel. Abunabba v. United States, 676 F.3d 329, 332 (3d Cir. 2012) ("Abunabba") (quoting Merando v. United States, 517 F.3d 160, 164 (3d Cir. 2008)). The FTCA, however, authorizes suits against the United States:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

See 28 U.S.C. § 1346(b)(1). Accordingly, "[t]he FTCA is a 'partial abrogation'" of the United States' sovereign immunity, see Abunabba, 676 F.3d at 332 (quoting Gotha v. United States, 115 F.3d 176, 179 (3rd Cir. 1997)), because it authorizes suits against the United States for such negligent or wrongful acts or omissions of federal employees while acting within the scope of their employment. See 28 U.S.C. § 1346(b)(1); Rinaldi v. United States, 904 F.3d 257, 273 (3d Cir. 2018) (stating that "[t]he FTCA offers a limited waiver of the federal government's sovereign immunity from civil liability for negligent acts of government employees acting within the scope of their employment" (citations omitted)).

11

To prove a FTCA claim, a plaintiff must establish six (6) elements:

"'[(1)] [a claim] against the United States, [(2)] for money damages, . . . [(3)] for injury or loss of property, or personal injury or death [(4)] caused by the negligent or wrongful act or omission of any employee of the Government [(5)] while acting within the scope of [their] office or employment, [(6)] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'"

See Brownback v. King, 592 U.S. 209, 212 (2021) (quoting FDIC v. Meyer, 510 U.S. 471, 477 (1994)).

## II.   DISCUSSION

### A.   Factual Record[2]

#### 1.   Events Occurring from September 2019 Until the End of 2020

Ortiz was confined at FCI Schuylkill from September 23, 2019, until October 27, 2022. See (SOF ¶ 5).  On February 27, 2020, Ortiz had a preventative health visit with non-party Registered Medical Assistant ("RMA") Delong, during which Ortiz reported "issues with [his] left shoulder" but, according to RMA Delong's Clinical Encounter report, Ortiz did not report he was in pain.  See (id. ¶ 6; Doc. No. 49-5 at 16).  RMA Delong's assessment of Ortiz was that he was "well and ha[d] no concerns at th[at] time," and RMA Delong counseled Ortiz to "[f]ollow up for sick call as needed, [to] eat[] healthy, [and to] exercise."  See (SOF ¶ 7; Doc. No. 49-5 at 19).

---

[2]  Although Ortiz filed a response to the Government's motion for summary judgment (Doc. No. 61), he did not specifically respond to the Government's statement of undisputed facts ("SOF") as required by Local Rule 56.1.  As such, the Court considers the facts in the Government's SOF to be undisputed for purposes of resolving its motion.  See M.D. Pa. L.R. 56.1 (requiring the non-moving party to file a "separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth" in movant's statement of material facts). Nevertheless, the Court will also consider the entirety of the record in determining whether summary judgment is appropriate in this case.

On March 2, 2020, Ortiz reported to Health Services for an evaluation performed by Dr. Mace-Leibson.  See (SOF ¶ 8).  Dr. Mace-Leibson's Clinical Encounter report from this visit states that Ortiz's chief complaint was "[b]ack [p]ain" and indicates that:

> Pt reports "my trap" as his issue.  Pt reports "like that for a year".  Denies any pain or hx of pain that he remembers "just got like that".  Pt reports exercising regularly and doing dead lifts.  He is most concerned with it being asymmetrical from other side and wants to "get it fixed".  Says other guys told him it could be fat tumor that could be cut out.

See (id. ¶¶ 9–11; Doc. No. 49-5 at 12).  Dr. Mace-Leibson examined Ortiz, and her post-exam comments were: "[E]xam of ms is completely uncharged from his OCT [sic] 28, 2019 visit[. N]o evidence of lipoma, it is shortened ms body c/w old injury (i.e., rupture distal tendon)[.]  ms otherwise well defined and strength is symmetrical and normal b/l and he has obviously been working out regularly[.]"  See (SOF ¶ 12; Doc. No. 49-5 at 14).  Dr. Mace-Leibson assessed Ortiz with "Injury muscle/fascia/tendon at shoulder/uppper [sic] arm, . . . Current – left trapezius," informed him to "[f]ollow-up at Sick Call as [n]eeded," provided him with a "back care booklet," "discussed at length" with him about "proper form and stretching," and "advised [him] that his ms body is permanently shortened and is just [a] cosmetic issue."  See (SOF ¶ 13; Doc. No. 49-5 at 14).

Ortiz had an evaluation encounter scheduled with FCI Schuylkill's Health Services at 12:30 p.m. on March 13, 2020, but he did not appear for this visit.  See (SOF ¶ 14; Doc. No. 49-5 at 11).  Approximately forty-five days later, on April 30, 2020, non-party Certified Registered Nurse Practitioner ("CRNP") Swabowski evaluated Ortiz in his cell for a sick call.  See (SOF ¶ 15).  Ortiz informed CRNP Swabowski that his "left trap [had been] swollen for over a year," and he requested a "second opinion."  See (SOF ¶ 15; Doc. No. 49-5 at 9).  CRNP Swabowski's notes from this visit state that Ortiz did not complain of pain or an injury, denied "numbness,

weakness or loss of function [in his] left arm," and reported "exercising and lifting [his] upper body regularly." See (SOF ¶ 15; Doc. No. 49-5 at 9). CRNP Swabowski conducted an examination of Ortiz, during which he noticed that Ortiz had "[s]welling and asymmetry [in his] left trapezius," observed Ortiz "reach[ his] left arm above [his] head without difficulty[,]" and noted that Ortiz had "[w]ell[-]developed upper body musculature." See (SOF ¶ 16; Doc. No. 49-5 at 9). He assessed Ortiz with an "[i]njury muscle/fascia/tendon at shoulder/uppper [sic] arm," and he directed Ortiz to "[f]ollow-up at Sick Call as [n]eeded." See (SOF ¶ 17; Doc. No. 49-5 at 9).

On June 16, 2020, CRNP Swabowski again saw Ortiz at his cell during sick call. See (SOF ¶ 18). Ortiz complained of "[c]onstant pain [in his] left neck and shoulder," which he described as "nerve pain." See (SOF ¶ 19; Doc. No. 49-5 at 7). Ortiz also reported that he was "taking ibuprofen as needed which" was ineffective. See (SOF ¶ 19; Doc. No. 49-5 at 7).

CRNP Swabowski examined Ortiz and noticed "[s]welling and asymmetry [in his] left trapezius" as well as Ortiz's "[w]ell[-]developed upper body musculature." See (SOF ¶ 20; Doc. No. 49-5 at 7). CRNP Swabowski also discussed the cosmetic nature of the issue with the Clinical Director, recommended over-the-counter analgesics as needed, and determined that no further treatment was necessary at the time. See (SOF ¶ 21; Doc. No. 49-5 at 7).

Approximately a week later, on June 25, 2020, CRNP Swabowski met with Ortiz at his cell during medical rounds. See (SOF ¶ 22). Ortiz "complained of increasing pain [in the] left [side of his] neck." See (SOF ¶ 22; Doc. No. 49-5 at 6). Ortiz also reported that his over-the-counter pain medication was ineffective, and he requested further treatment. See (SOF ¶ 22; Doc. No. 49-5 at 6). In his Clinical Encounter report, CRNP Swabowski noted that Ortiz did not appear to be in acute distress or have a functional deficit. See (SOF ¶ 22; Doc. No. 49-5 at 6).

The report also indicates that CRNP Swabowski discussed Ortiz's issue with the Clinical Director, concluded that no further treatment was needed at the time, and "[r]einforced [the] current treatment plan with [Ortiz]." See (SOF ¶ 23; Doc. No. 49-5 at 6).

On July 8, 2020, CRNP Swabowski met with Ortiz during medical rounds. See (SOF ¶ 24). In his Clinical Encounter report, CRNP Swabowski notes that Ortiz requested further treatment due to "increasing pain [in the] left [side of his] neck" and again reported that the over-the-counter pain medication he was taking was ineffective. See (SOF ¶ 24; Doc. No. 49-5 at 5). CRNP Swabowski also noted that Ortiz did not appear to be in acute distress or have a functional deficit, and he determined that no further treatment was necessary at that time. See (SOF ¶ 24; Doc. No. 49-5 at 5).

On September 8, 2020, non-party Physician Assistant ("PA") Steffan saw Ortiz at Health Services due to shoulder pain and a testicular lump. See (SOF ¶ 26; Doc. No. 49-5 at 1). Ortiz refused a testicle/scrotal exam, but he inquired about "what [was] going to be 'done about his trapezius muscle" because he was "[c]onvinced he ha[d] 'nerve damage.'" See (SOF ¶ 27; Doc. No. 49-5 at 3). PA Steffan's Clinical Encounter report states that he educated Ortiz about, inter alia, the findings of his multiple prior visits and findings from his previous examinations. See (SOF ¶ 28; Doc. No. 49-5 at 3). PA Steffan also counseled Ortiz to "[f]ollow-up at Sick Call as [n]eeded" and to "[r]eturn [t]o Sick Call if [n]ot [i]mproved." See (SOF ¶ 28; Doc. No. 49-5 at 3).

### 2.    Events During 2021

Ortiz tested positive for COVID-19 at a screening encounter with non-party PA Andreuzzi on March 4, 2021. See (SOF ¶ 29). During this encounter, Ortiz denied any "symptoms or complaints" and did not have any "fatigue, aches, pains, headache, [or] persistent

15

pain in [his] chest." See (SOF ¶ 30).  Approximately three weeks later, on March 23, 2021, Ortiz

did not appear for his appointment at Health Services relating to "wanting [his] inhaler back."

See (SOF ¶ 31; Doc. No. 49-6 at 46).

On May 10, 2021, non-party Registered Nurse ("RN") McIntyre examined Ortiz in his

housing unit, and Ortiz told RN McIntyre that he had "a torn ligament in [his] shoulder and it

keeps getting bigger," which he thought was "affecting [his] breathing" and his ability to work.

See (SOF ¶¶ 32, 34; Doc. No. 49-6 at 42, 43).  Ortiz reported that he "told them [he] needed [his]

inhaler back."  See (SOF ¶ 32; Doc. No. 49-6 at 42).  Despite Ortiz's report of affected

breathing, RN McIntyre's notes state that his lungs were "clear to auscultation," his Sp02 was

98%, and he did not appear at his last "call out pertaining to being re-prescribed [an] inhaler."

See (SOF ¶ 34; Doc. No. 49-6 at 43).

RN McIntyre's assessment notes that Ortiz had a "baseball[-]size[d] swelling [in his] left

shoulder" and "[n]o erythema."  See (SOF ¶ 33; Doc. No. 49-6 at 43).  Ortiz also reported that he

"was told in the past that he had a 'torn ligament' but [said it was] getting worse" and

"complain[ed] of internal pain to palpation."  See (SOF ¶ 33; Doc. No. 49-6 at 43).  Based on

this encounter, RN McIntyre recommended that Ortiz should be "[e]valuated by [the p]rovider"

and "[f]ollow-up at Sick Call as [n]eeded."  See (SOF ¶ 35; Doc. No. 49-6 at 43).

The day after Ortiz's visit with PA McIntyre, PA Andreuzzi evaluated him at Health

Services about complaints of shoulder pain and shortness of breath.  See (SOF ¶ 36).  In his

Clinical Encounter report, PA Andreuzzi describes his visit with Ortiz as follows:

> Inmate sent to HSU from mainline to be evaluated for c/o SOB and left shoulder
> pain.  Inmate was very evasive in answering questions, giving vague answers, no
> answer at all or changing the subject when asked questions.  States was diagnosed
> in 2003 with asthma but doesn't know and/or can't remember what type of testing
> was done to determine had it.  States only had a rescue inhaler.  Asked if ever used
> long[-]acting inhaler several times and would never give an answer.  States now is

16

experiencing SOB at night and needs his inhaler back.  States has not had an inhaler since 2016 and didn't need it until now.  Asked what causes to feel SOB or triggers asthma and says it depends what causes it and will not give more definite answer than this.  States did smoke 1 ppd for 5-6 years but not in last 17 years.  States when had inhaler would use it 2 times a day.  Also states having pain in left trap/shoulder. States initially injured in 2019 while at Ray brook [sic] but they didn't do anything for it as they were sending me here and we would take care of it.  Asked how injured and states was working out and next day got swollen.  Asked several times what specifically did to injure and will not say.  Asked several times how long has been swollen and will not say.  Just that it is getting bigger.  States is causing pain in left arm and chest but nothing further.  Denies additional complaints.

See (SOF ¶¶ 37–42; Doc. No. 49-6 at 39).  Based on this visit with Ortiz, PA Andreuzzi ordered a consultation request for Ortiz's left trapezius area, noting that the mass "measur[ed] from anterior aspect 3.5 inches [in] length, 4 inches wide[,] and 3 inches high" and was "firm, tender to palpation, [and had] little mobility."  See (SOF ¶ 43; Doc. No. 49-6 at 40).

On May 12, 2021, an FCI Schuylkill lieutenant sent Ortiz to Health Services because of Ortiz's complaints of chest pain.  See (SOF ¶ 44; Doc. No. 49-6 at 37).  During this visit, Ortiz reported to PA Andreuzzi that, inter alia: (1) he had been "having episodes of poking sensation [sic] in [the] left [side of his] chest that come[ and] go and only last a few seconds" over the past two weeks; (2) the area felt worse if he pressed on it; (3) did not have any associated symptoms; (4) the "lump in [his] left trap [was] causing mad pain," and he wondered whether it was causing the pain in his chest; and (5) the lump "caus[ed] pain when he trie[d] to lift [up his] arm" and it will no longer go above his head.  See (SOF ¶ 45; Doc. No. 49-6 at 37).  PA Andreuzzi examined Ortiz, discussed cardiac versus non-cardiac chest pain, reviewed Ortiz's EKG, answered Ortiz's questions, and informed Ortiz that he ordered a consult for his left trapezius mass that was pending approval and scheduling.  See (SOF ¶ 46; Doc. No. 49-6 at 82).

On May 16, 2021, Ortiz pressed the duress button in his cell at 4:00 a.m. after he awoke "with trouble breathing and pain/stiffness" in his left arm/hand.  See (SOF ¶ 47; Doc. No. 49-6 at

17

33).  Ortiz was taken to Health Services, where he was examined by a member of the medical staff and found to have fingertips which were cold to the touch as well as a delayed capillary refill.  See (SOF ¶ 48; Doc. No. 49-6 at 32–33).  Ortiz was then sent to the emergency room for further evaluation.  See (SOF ¶ 49).

Later the same day, Ortiz returned to FCI Schuylkill from the hospital with a diagnosis of a lipoma.  See (id. ¶ 50).  Ortiz's discharge instructions from the hospital recommended: "PAIN MEDICATION AS NEEDED.  CONSIDER SURGICAL REFERRAL."  See (SOF ¶ 51; Doc. No. 49-6 at 29, 170, 203).  Ortiz's hospital records and report from this visit to the emergency room were scanned into his BOP medical record, and those records explain that a lipoma is a "noncancerous (benign) tumor that is made up of fat cells."  See (SOF ¶ 52; Doc. No. 49-6 at 171).

On May 20, 2021, PA Andreuzzi, after consulting with the Clinical Director, noted that an inhaler was not clinically indicated for Ortiz and, as such, canceled an ultrasound consultation for him.  See (SOF ¶ 53; Doc. No. 49-6 at 28).  PA Andreuzzi also noted that he would request a "general surgery consult" once they received Ortiz's CT scan report from the hospital.  See (SOF ¶ 53; Doc. No. 49-6 at 28).

PA Andreuzzi met with Ortiz in the housing unit to discuss his lipoma, treatment plan, and the inhaler, on May 26, 2021.  See (SOF ¶ 54).  In his Clinical Encounter report following the visit, PA Andreuzzi summarizes his visit with Ortiz as follows:

> To inmate housing unit performing sick call and to speak with inmate regarding neck mass and inhaler.  Told inmate that just received CT scan report from hospital, spoke with the CD and will be placing surgery consult.  Inmate states the doctor diagnosed me wrong and how do I know what this is in my neck.  I told the inmate the CT scan says it is a lipoma, which is noncancerous, and once you see the surgeon they will determine what happens next.  Inmate continues on about not being diagnosed right.  I then told inmate I spoke with the CD and is no current indication for inhaler.  Inmate then states my breathing is fine now but what

18

> happens when it is not. I again told inmate there is currently no clinical indication for an inhaler and one will not be issued. Inmate then states is having coldness and swelling in left arm form [sic] mass but is fine now. States is having pain in left arm and chest and what am I going to do about it. States is buying and taking pain medicine from commissary and isn't working. I asked inmate what job is in Unicor and states is forklift driver. I asked inmate what does for exercise and will only state I haven't exercised for awhile [sic]. Will not tell what does for exercise, how long has supposedly stopped or answer any further questions. Denies additional complaints.

See (SOF ¶¶ 55–57; Doc. No. 49-6 at 26). PA Andreuzzi also notes that, inter alia: (1) Ortiz "continued to be evasive in answering questions"; (2) a review of Ortiz's commissary purchases over the past six months showed only one purchase of Motrin on May 25, 2021, which contradicted his statements about buying and taking over-the-counter pain medicine; (3) Ortiz was observed "walking around housing talking with other inmates without difficulty or symptoms" and was "moving, twisting, bending [his] head, spine, [and] arms without difficulty or symptoms"; and (4) Ortiz's "physical appearance/musculature is inconsistent with someone who states [they are] not exercising." See (SOF ¶ 58; Doc. No. 49-6 at 26, 27). PA Andreuzzi also questioned whether Ortiz had a "secondary agenda." See (SOF ¶ 58; Doc. No. 49-6 at 27). He nevertheless requested a surgery consultation with a general surgeon. See (SOF ¶ 59; Doc. No. 49-6 at 27).

On June 2, 2021, Ortiz became confrontational with PA Andreuzzi while being assessed for a sick call at Ortiz's housing unit. See (SOF ¶ 60; Doc. No. 49-6 at 25). PA Andreuzzi describes this encounter with Ortiz in his Clinical Encounter report as follows:

> To inmate housing unit performing sick call with inmate approaching this MLP in confrontational manner to c/o about pain from mass in neck. States is causing to have pain in neck and also in chest (pointing to mid left chest anterior axillary line area). States was to be prescribed something for pain from hospital and has never gotten it. Told inmate is to be purchasing own pain medicine from commissary with inmate stating can't take the motrin as is burning a hole in my stomach. Told inmate I reviewed his commissary for past 6 months the last time we spoke and have only seen 1 purchase of pain medicine Motrin on 5-25-21 with inmate

19

continuing to be confrontational immediately stating I am supposed to be getting something from the hospital for pain and you aren't giving it to me. Told inmate will review hospital record to see if something was recommended but will still have to purchase own from commissary and to purchase Tylenol then if motrin is upsetting stomach as states. Inmate then walked away from this MLP with no further interaction. Review of hospital record shows no recommended or prescribed medicine for pain and only with statement of pain medication as needed. Must continue to believe secondary agenda by inmate as continues to provide information that is not supported by record.

See (SOF ¶¶ 60–65; Doc. No. 49-6 at 25).

On August 19, 2021, Ortiz again met with PA Andreuzzi at Health Services. See (SOF ¶ 66). PA Andreuzzi's notes relating to visit are as follows:

Inmate presents to HSU SC asking why hasn't been seen yet for mass on neck. Inmate told again that a consult was placed, had to be approved, and once approved then is scheduled with the date being what the provider offers. Inmate then becomes confrontational stating has been waiting for a few months to get this taken care of and hasn't yet. I reviewed record and told inmate that there was a date and time to be evaluated by the surgeon and it will not be removed at that visit. [A]nother consult will have to be written, approved and then scheduled for the surgery with inmate continuing to be confrontational states needs something for pain from neck mass. I again told inmate as previously that needs to buy pain medicine from commissary if feels needs it. Inmate said I buy the Motrin and can't take it because it hurts my stomach. I again told inmate he can then purchase Tylenol for pain if he can't take the Motrin with inmate continuing to be confrontational states he isn't going to buy any pain medicine and I need to give him something for it. I again told inmate he needs to purchase own pain medicine and visit was terminated at this point. Review of inmates record shows three purchases of pain medicine motrin on 5-25 and 6-2-21 and Tylenol on 6-30-21 with nothing before or since. Continue to believe inmates [sic] actions driven by secondary agenda as continues to not comply with recommended treatments.

See (SOF ¶¶ 66–71; Doc. No. 49-6 at 24).

On August 26, 2021, Ortiz met with Dr. Neil W. Fisher of Integrated Medical Group, P.C. regarding a "large, soft tissue mass at the base of his left neck." See (SOF ¶ 72; Doc. No. 49-6 at 123). Dr. Fisher determined that Ortiz had "a large, multilobulated mass" at the base of his left neck, which measured 20 cm x 12 cm. See (SOF ¶ 73; Doc. No. 49-6 at 124). Dr. Fisher

also recommended a "[s]urgical excision under general anesthesia with complex closure and probable placement of a drain." See (SOF ¶ 73; Doc. No. 49-6 at 124).

On September 8, 2021, PA Andreuzzi requested that Ortiz have surgery to have the mass removed. See (SOF ¶ 74). PA Andreuzzi then ordered labs for pending surgery on September 22, 2021. See (id. ¶ 75). Less than a week later, PA Andreuzzi met with Ortiz regarding his complaints of shoulder pain and vision issues, at which time PA Andreuzzi reminded Ortiz that he was placed on the optometrist schedule, and Ortiz would see the optometrist once there was an appointment scheduled. See (id. ¶ 76; Doc. No. 49-6 at 21). PA Andreuzzi also told Ortiz that he needed to take over-the-counter medication because he "continu[ed] to be noncompliant with [the] recommended treatment" as shown by the records of his limited commissary purchases. See (SOF ¶ 76; Doc. No. 49-6 at 21).

Dr. Fisher removed the lipoma from Ortiz's shoulder/back area on October 8, 2021, and the lipoma weighed 263 grams and measured 14x8x5cm. See (SOF ¶ 77). Ortiz returned to FCI Schuylkill later that day, and PA Andreuzzi noted Ortiz's prescribed medication and wound care recommendations. See (SOF ¶ 78; Doc. No. 49-6 at 18).

On October 12, 14, 15, and 16, 2021, FCI Schuylkill medical staff provided Ortiz with care for his wound following his surgery. See (SOF ¶ 79). Then, on November 16, 2021, CRNP Swabowski ordered a surgical follow up appointment to occur by December 29, 2021. See (id. ¶ 80). On December 9, 2021, FCI Schuylkill staff transported Ortiz to his surgical follow-up appointment with Dr. Fisher, but upon their arrival, the staff was informed that the appointment was canceled without prior notice to the prison. See (id. ¶ 81).

### 3.    Events During 2022

Ortiz had his post-surgical consultation with Dr. Fisher on January 3, 2022, during which Ortiz expressed no complaints of pain or discomfort at the surgical site. See (id. ¶ 82; Doc. No. 49-7 at 72–73). In addition, Dr. Fisher noted that Ortiz's incision was well-healed, he had normal range of motion, his neurovascular examination was normal, and that his asserted symptomology was unrelated to his surgery. See (SOF ¶ 83; Doc. No. 49-7 at 73). Dr. Fisher also noted that Ortiz did not have any restrictions from a surgical standpoint and no further surgical follow up was scheduled. See (SOF ¶ 84).

The BOP's medical records show that Ortiz did not seek medical attention for his trapezius/shoulder for the remainder of his time at FCI Schuylkill, i.e., until October 27, 2022. See (id. ¶¶ 85–86). Moreover, Ortiz's medical records from February 27, 2020, when he first complained of shoulder pain, and October 27, 2022, lack any report, diagnosis, or treatment of anxiety, depression, nausea, sleeplessness, or headaches. See (id. ¶ 87).

### 4.    Events During 2023

Ortiz sought and received medical treatment for his shoulder pain at FCI Fort Dix on January 27, 2023. See (id. ¶ 88). Ortiz's exam was normal, medical staff ordered ibuprofen, and they instructed him to return to sick call if needed. See (id.).

Approximately three months later, on April 21, 2023, Ortiz sought medical treatment for his shoulder pain at FCI Fort Dix. See (id. ¶ 89). His examination was negative for muscle atrophy, swelling, erythema, or frozen shoulder. See (id.). Medical staff instructed Ortiz to obtain ibuprofen and return to sick call if needed. See (id.).

On September 1, 2023, Ortiz requested medical attention for left-side shoulder and neck pain at FCI Fort Dix. See (id. ¶ 90). The medical staff examined him and determined that his

22

shoulder presented normal anatomical landmarks without erythema or swelling, he had full range of motion, and muscle strength at 5 on a scale of 5.  See (id.).  They also ordered a radiology consultation for Ortiz's cervical spine.  See (id. ¶ 91).

On December 14, 2023, a doctor at FCI Fort Dix examined Ortiz in the Chronic Care Clinic.  See (id. ¶ 92).  The doctor noted that, inter alia, Ortiz did not have any issues ambulating, there was "[n]o sign or movement to suggest [that he was] symptomatic from lumbar disease," Ortiz could "get on and off the exam table without difficulty," and he had "[full range of motion" x 4 motor 5/5 in all extremities."  See (Doc. No. 49-8 at 2).  On December 20, 2023, Ortiz had an x-ray performed of his cervical spine at FCI Fort Dix.  See (SOF ¶ 93).

### 5.    Events During 2024

On September 18, 2024, Ortiz attended a Chronic Care Clinic visit with a doctor at FCI Fort Dix, who noted that Ortiz has a history of "chronic left upper extremity numbness that starts along [his] neck and goes onto [his] arm and forearm to his hand."  See (id. ¶ 94; Doc. No. 49-9 at 21).  The doctor also noted that Ortiz "claim[ed] he has had this problem since his surgery for his lipoma on [his] neck," and he explained that "[t]he numbness comes and goes at times" and is "not always there."  See (SOF ¶ 94; Doc. No. 49-9 at 21).  Ortiz also denied any weakness at the time.  See (SOF ¶ 94; Doc. No. 49-9 at 21).  During this visit, the doctor renewed Ortiz's Albuterol medication, ordered routine labs, requested a routine neurology consultation and EMG for Ortiz's left upper extremity, and made a provisional diagnosis of "Neuropathy of the Brachial Plexus."  See (SOF ¶ 95; Doc. No. 49-9 at 22–23).

Ortiz attended an outside neurology appointment and underwent EMG testing on November 7, 2024.  See (SOF ¶ 96).  Ortiz's neurology examination indicated that he did not display any swelling or edema, his strength was reasonable with some guarding, he had no fixed

sensory deficit, and he was negative for "Tinel's phenomena" at the wrist and elbow points.  See

(id. ¶ 97).  Additionally, the EMG study marked normal results and did "not support the

electrical diagnosis of an active radiculopathy or a discrete localized brachial plexus lesion."  See

(id. ¶ 98).

### 6.      Events During 2025

On January 16, 2025, Ortiz complained that the medication prescribed for his left

shoulder pain was not helping, and the medical provider increased the dosage.  See (id. ¶ 99).

On February 10, 2025, Ortiz's medication was renewed.  See (id. ¶ 100).

### 7.      Expert Opinion of the Government's Expert

Board-certified General and Cosmetic Surgeon J. John Makipour, M.D., FACS, reviewed

Ortiz's BOP electronic medical records from October 2019 through September 2024, and

prepared an expert report that the Government attaches to its SOF.  See (id. ¶ 101; Doc. No. 49-

11).  In his report, Dr. Makipour states as follows:

> Ortiz is a patient who complained about pain in the location of his left trapezius
> muscle in March of 2020.  At this time, physical exams were limited nationally due
> to the Covid pandemic.  An encounter was documented at this time noting . . .
> Ortiz's concerns, and a diagnosis of asymmetry due to prior muscular injury was
> made.  Anti-inflammatories were recommended.  At the time, physical exam
> documented appropriate musculature and active range of motion.  Multiple requests
> were then processed through the [BOP].  He contracted Covid in March of 2021
> and was isolated.  In May of 2021, [h]e presented to the Emergency Department,
> where a CT scan diagnosed an 11x4x4 cm lipoma of the left trapezious [sic].  He
> was discharge[d], and given a handout regarding lipoma.  An elective referral to a
> general surgeon was made.  He was evaluated 3 months later by a general surgeon,
> and had excision of the mass weeks after the initial consult.  Time from complaint
> to diagnosis was approximately 15 months, and time from diagnosis to surgery was
> approximately 5 months.  He was seen 3 months after surgery for a post-operative
> visit that was uneventful, and no residual postoperative concerns were documented.
> In April of 2023 He [sic] complained of left shoulder pain but not muscle atrophy
> or other acute concerns were documented.  In September of 2023, he complained
> of residual pain at the surgical site but physical exam was unremarkable.  By
> February of 2024, He [sic] had full range of motion on exam and no pain
> documented.

Overview of Pathology:

Lipomas are benign (not cancer) fatty masses that typically originate in the soft tissues.  They tend to occur independently of the surrounding fatty tissues—they do not increase in size with . . . weight gain or get smaller with weight loss.  They are generally asymptomatic, although complaints of mild pain are occasionally seen.  Most liomas [sic] don't need treatment.  However, a lipoma can be removed if requested.

Expert Opinion:

In my expert opinion the standard of care was at all times met in the evaluation, diagnosis, and management of . . . Ortiz's care.  While there was a postponement in the diagnosis of his lipoma; this was precipitated by the extraordinary circumstances of minimizing contact during patient evaluations due to the Covid pandemic that was instituted universally around the globe.  Timliness [sic] of diagnosis was reasonable given the benign nature of his disease, minimal symptoms reported, and circumstances of the time.  Even if a timelier diagnosis had been made, most hospitals around the country had restricted elective (non-urgent/emergent) surgeries such as lipoma removal, and treatment would have been appropriately delayed during this period in any case.  Furthermore, it is more probable than not that there were no adverse outcomes due to the delay in treatment.  I think it is likely he would have had a similar recovery whether surgery had been performed a year earlier or a year later.  The fact that he had surgery 5 months after diagnosis, and 6 weeks after meeting with a surgeon, adds credence to the fact that lipomas are not time sensitive pathologies.  His postoperative appointment with his surgeon did not identify any lingering complications from surgery, and the last exam in his charge dated February 12th 2024 documented full range of motion with no residual neck or back pain.  I do not believe . . . Ortiz will have any lasting medical issues related to the timing of diagnosis or surgery of his lipoma.

My conclusions and opinions relating to this case are based on my education, training, experience as a general surgeon, research with which I have been involved/conducted/participated, my teaching, and publications, which are outlined in my CV, as well as my ongoing continuing medical education, my familiarity with the standards of medical practice in the community, and the information contained in [Ortiz's] medical records . . . .  My opinions are also based upon information which is of a type reasonably relied upon by physicians who have expertise in such areas . . . .

See (SOF ¶¶ 102–10; Doc. No. 49-11 at 2–3).

25

**8.    The BOP's Covid-19 Policies**

On or about August 31, 2020, the BOP published its Covid-19 Pandemic Response Plan, version 1.0.  See (SOF ¶ 111; Doc. No. 49-12).  The Pandemic Response Plan was divided into eleven modules based on guidance from the Centers for Disease Control, the World Health Organization, and the Department of Justice.  See (SOF ¶ 112; Doc. No. 49-12).  Each module was intended to provide a detailed outline of recommendations for BOP facilities to follow, and the modules included, inter alia, "Module 7.  Non-COVID-19 Routine Medical & Dental Services."  See (SOF ¶¶ 112–13; Doc. No. 49-12).  Module 7 generally suggested that inmates should have continued access to health care during the pandemic and that the institutions consider alternatives to the sick call process and postpone non-urgent consultations.  See (SOF ¶ 114).

**B.    Analysis**

**1.    Ortiz's Summary Judgment Responses**

As noted above, Ortiz never filed a "separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in" Defendants' SOF, as to which he "contend[s] that there exists a genuine issue to be tried," as required by the Local Rules.  See M.D. Pa. L.R. 56.1; infra at 13 n.1.  Additionally, in his opposition and sur-reply briefs (Doc. Nos. 61, 64), Ortiz never cites to any evidence in the summary judgment record during the limited portions of those submissions in which he references alleged facts in this case.

In his opposition brief, Ortiz's identification of alleged facts consists of only the following:

> Surgery was needed to not only remove a large mass (see attached photographs) on his shoulder and neck area, but, importantly, to perform laboratory testing for cancerous cells.  Ortiz had numerous outside medical appointments cancelled [sic] over a two[-]year period.  The prison doctor discounted Ortiz's complaints about

26

the steady increase in size of the mass that was growing in his left shoulder area by, initially, concluding, without performing any tests, or having a biopsy procedure, that the tumor or mass was non-cancerous, and that it was caused by Ortiz's exercise regimen. In addition, the prison doctor surmised that surgery could wait until Ortiz's release from prison, and that any surgery would be strictly of a cosmetic nature. Meanwhile, the mass continued to increase in size and area. Throughout the aforesaid two-year period, the plaintiff suffered extreme anxiety and mental depression from a great fear that the mass was cancerous, and that he would die in prison. Those fears were totally discounted by the prison doctor, who advised that surgery would be of a cosmetic nature, and not medically necessary even though the mass was increasing in size.

Following the cancellation [sic] of several outside consultations with surgeons, and a two-year wait, surgery was performed to remove the mass or tumor, from Ortiz's left shoulder area. Testing revealed it was benign and non-cancerous, however, the cause for its existence was not revealed.

See (Doc. No. 61 at 2–3).[3] In his sur-reply brief, Ortiz includes only the following alleged

factual references:

The medical records in this proceeding clearly demonstrate that Nathaniel Ortiz complained of chronic pain for an extended period, and of his inherent fear that the mass on his neck and shoulder area was cancerous. His complaints and fears were dismissed for no stated reason or explanation.

. . .

[T]he present plaintiff . . . [was] diagnosed as suffering from a condition for which surgery was the sole option; and his condition not only caused a great amount of pain, but, was a potential life threatening situation unless treated through surgical intervention, thereby causing him a great amount of stress and anxiety, with associated sleeplessness and nervousness, etc.

---

[3] Although Ortiz mentions that he attached photographs to his opposition brief, there were no such photographs attached to it. See generally (Doc. No. 61). There were, however, three photographs attached to his sur-reply brief. See (Doc. No. 64-1 at 1–2). Presuming those photographs are of Ortiz, they are insufficient to create a genuine issue of material fact in this case because, inter alia: (1) two of the three photographs are so poorly lit that they do not show a lump on Ortiz's body, see (id.); (2) it is not evident that there is a lump on Ortiz's body in the sole photograph in which the Court can view the left side of Ortiz's upper body, see (id. at 2); (3) if there is a lump, the photograph does not show its size, especially considering that it appears that Ortiz's shoulders and upper back are muscular, see (id.); and (4) the photographs are undated, and Ortiz does not indicate in his reply brief when the photographs were taken. See (Doc. No. 64 at 5 (referencing photographs)).

27

> . . .
>
> Attached hereto, are copies of the plaintiff's medical records and results of testing and evaluations, which clearly demonstrate that for a period of at least fifteen (15) months, the prison's medical personnel discounted the symptoms he was experiencing, and which were visibly apparent (see the photographs included as exhibits). Those records corroborate that the plaintiff's complaints commenced during the year of 2019, and continued until May of 2021, when surgery was performed to remove the mass, diagnosed to be Lipoma [sic].
>
> Although surgery removed the Lipoma, lingering effects remain as plaintiff experienced numbness in his arm and hand, including fingers. In addition, the plaintiff was instructed to refrain from heavy lifting, and no reaching in an upward manner.

See (Doc. No. 64 at 3, 4–5).

Ortiz's limited references to facts allegedly in the summary judgment record in this case is inadequate when responding to the Government's motion for summary judgment. Once the Government shows that there is no genuine issue of material fact, the burden shifts to Ortiz to show that such a genuine dispute exists by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited" by the Government "do not establish the absence . . . of a genuine dispute . . . ." See Fed. R. Civ. P. 56(c)(1) (emphasis added). Ortiz has not taken either of these steps to satisfy his burden as the non-moving party in this case.

Ortiz's failure to properly reference the record is problematic for another reason, namely, the lack of evidence in the record to support many of his limited factual assertions contained in his briefs. For instance, although Ortiz alleges that he "needed" surgery "to perform laboratory testing for cancerous cells," see (Doc. No. 61 at 2), he points to no documentary evidence

28

showing that any medical professional recommended that he receive laboratory testing for cancerous cells or needed surgery on his lipoma to test for cancer.

Ortiz also asserts that he had "numerous outside medical appointments canceled over a two[-]year period," see (id.), even though his medical records show that the only appointment cancellation pertaining to the lump on his shoulder occurred on December 9, 2021, when FCI Schuylkill staff transported Ortiz to his surgical follow-up appointment with Dr. Fisher, only to learn on their arrival that the appointment was canceled without notice to the prison. See (SOF ¶ 81).[4]  Ortiz also states that "[t]he prison doctor discounted [his] complaints about the steady increase in size of the mass" without performing any tests or referring him for a biopsy and concluded that it was caused by his exercise regimen. See (Doc. No. 61 at 2–3).  However, Ortiz does not identify the "prison doctor," and even if the Court presumes that he references Dr. Mace-Leibson, the summary judgment record shows that she saw him on one occasion, March 2, 2020, and her notes from this visit indicate that Ortiz told her that the issue with "his trap" had been "like that for a year."  See (SOF ¶¶ 8–13; Doc. No. 49-5 at 12–14).  There is no indication from Dr. Mace-Leibson's notes from this visit that Ortiz complained about the lump increasing in size, and her notes do not show that she determined that it was caused by his exercise regimen (even if she stated it appeared to be from a previous injury). See (Doc. No. 49-5 at 12–14).  Moreover, although Ortiz contends that "the prison doctor surmised that surgery could wait until [his] release from prison, and that any surgery would be strictly of a cosmetic nature" there is no evidence in the record showing that any doctor, including Dr. Mace-Leibson, told him that

---

[4]  The only other cancellation the Court located in the record occurred when PA Andreuzzi, after consulting with the Clinical Director, noted that an inhaler was not clinically indicated and canceled an ultrasound consultation on May 20, 2021.  See (SOF ¶ 53; Doc. No. 49-6 at 28).

surgery could wait until after he was released from prison,[5] or that he would need surgery to fix his "cosmetic" issue.

Finally, Ortiz asserts that his medical records show that he consistently "complained" about "his inherent fear that the mass on his neck and shoulder area was cancerous," and that he suffered from a condition that was "potential[ly] life threatening unless treated through surgical intervention." See (Doc. No. 64 at 4). He points to no medical records, and the Court could not find any, showing that he consistently complained for over a year about his fear that his lump was cancerous, or any records indicating that Ortiz's lipoma was potentially life threatening unless he had surgery. Additionally, the medical records Ortiz attaches to his sur-reply brief do not support his factual assertions. See (Doc. No. 64-1 at 3–12).

Overall, Ortiz's failure to directly and clearly provide the Court with, or at least cite to, record evidence that contradicts the Government's asserted undisputed facts, warrants this Court granting summary judgment in the Government's favor. It is not this Court's obligation, despite Ortiz's pro se and incarcerated status, to search through the entire record to determine if portions of it support his factual assertions or argument that there are genuine issues of material fact as to his FTCA claims in this case. See Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 n.8 (3d Cir. 2006) ("'Judges are not like pigs, hunting for truffles buried in' the record." (quoting Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys., 309 F.3d 433, 436 (7th Cir. 2002))), as amended (May 5, 2006). Nevertheless, despite Ortiz's failure to meet his obligations when responding to Defendants' motion for summary judgment, the Court will address whether summary judgment is appropriate on each of Ortiz's FTCA claims.

---

[5]  According to the BOP's Inmate Locator (https://www.bop.gov/inmateloc/), Ortiz has an anticipated release date of August 6, 2040.

30

## 2.    Medical Malpractice

The Government moves for summary judgment on Ortiz's FTCA medical malpractice claim because (1) Ortiz lacks an expert opinion stating that there was a breach in the applicable duty of care, (2) Ortiz's medical records and the expert opinion of Dr. Makipour show that no breach of care occurred, and (3) Ortiz failed to produce any evidence, including an expert opinion, showing that any breach caused him to suffer an injury.  See (Doc. No. 51 at 24–32).  In response, Ortiz contends that the evidence in the record shows that FCI Schuylkill's medical staff (including the "prison doctor") discounted his complaints of pain, his concerns about potentially having cancer, and the increasing size of the lump, despite not performing any exam on his person.  See (Doc. No. 61 at 2–3).  He further argues that he does not require an expert in this case based on res ipsa loquitor, because:

> a layperson would discern that an unexplained and untested tumor would cause a person to suffer great anxiety, sleeplessness, fear, and mental depression from watching the tumor grow larger on a daily basis over a two-year period without access to a surgeon for its removal and testing.  No medical expert is required in order for a jury of laypersons to be able and comprehend a plaintiff's fear, anxiety, and mental depression, from not knowing whether the tumor is life threatening, or whether it will continue to grow and create other problems from its presence, all because prison doctors refused to provide the proper treatment to resolve the problem.

See (id. at 4–5).  As explained below, the Court agrees with the Government that Ortiz's failure to produce any expert evidence in support of his medical malpractice claim is fatal, in itself, to this claim.

For a plaintiff to prevail on a professional negligence/medical malpractice claim under Pennsylvania law, "the plaintiff must prove that the defendant's treatment fell below the appropriate standard of care."  See Brady v. Urbas, 111 A.3d 1155, 1161 (Pa. 2015) (citations

31

omitted); Toogood v. Owen J. Rogal, D.D.S., P.C., 824 A.2d 1140, 1145 (Pa. 2003) (stating that "medical malpractice can be broadly defined as the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient . . . ."). "[W]hen a plaintiff's medical malpractice claim sounds in negligence, the elements of the plaintiff's case are the same as those in ordinary negligence actions." Toogood, 824 A.2d at 1145; accord Ditch v. Waynesboro Hosp., 917 A.2d 317, 322 (Pa. Super. Ct. 2007), aff'd, 17 A.3d 310 (Pa. 2011), (providing that "the basic elements of medical malpractice and ordinary negligence are the same . . . " (citation omitted)). Thus, for ordinary and medical negligence claims, a plaintiff must establish: (1) a duty of care owed by the physician to the patient; (2) a breach of that duty; (3) the breach of that duty was the proximate cause of the harm suffered by the patient; and (4) the damages suffered were a direct result of that harm. See Mitchell v. Shikora, 41 A.3d 307, 314 (Pa. 2019) (citing Hightower-Warren v. Silk, 698 A.2d 52, 54 (Pa. 1997)). Put another way, "to prevail on a claim of medical negligence, the plaintiff must prove, inter alia, that the defendant's treatment fell below the appropriate standard of care—that is, varied from accepted medical practice." See Mitchell v. Shikora, 209 A.3d 307, 314–15 (Pa. 2019). The plaintiff bears the burden of proof on these elements by a preponderance of the evidence. See Rippee v. Grand Valley Mfg. Co., 762 F.2d 25, 27 (3d Cir. 1985).

As "[w]ith all but the most self-evident medical malpractice actions[,] there is also the added requirement that the plaintiff must provide a medical expert who will testify as to the elements of duty, breach, and causation." See Quinby v. Plumsteadville Fam. Prac., Inc., 907 A.2d 1061, 1070–71 (Pa. 2006) (citation omitted); accord Mitchell, 209 A.3d at 315 (providing that a "plaintiff in a medical negligence matter is required to present an expert witness who will testify, to a reasonable degree of medical certainty, regarding the standard of care (duty); that the

32

acts of the physician deviated from the standard or care (breach); and that such deviation was the

proximate cause of the harm suffered" (citation omitted)).  The instances in which expert

opinions may be unnecessary in medical malpractice cases are limited:

> Courts sitting in medical malpractice cases require detailed expert testimony because a jury of laypersons generally lacks the knowledge to determine the factual issues of medical causation; the degree of skill, knowledge, and experience required of the physician; and the breach of the medical standard of care.  In contrast, plaintiffs in res ipsa loquitur cases rely on the jury to fill in the missing pieces of causation and negligence, inherent in their cases, with the jury's common experience.  Determining whether there was a breach of duty, however, involves a two-step process: the court must first determine the standard of care; it then must examine whether the defendant's conduct measured up to that standard.  Not only does the plaintiff have the burden of proving that the defendant did not possess and employ the required skill and knowledge, or did not exercise the care and judgment of a reasonable professional, he or she must also prove that the injury was caused by the failure to employ that requisite skill and knowledge.  We have previously concluded that this must be accomplished with expert medical testimony presented at trial by doctors testifying as expert witnesses.
>
> Res ipsa loquitur must be carefully limited, for to say whether a particular error on the part of a physician reflects negligence demands a complete understanding of the procedure the doctor is performing and the responsibilities upon him at the moment of injury.  Thus, in evaluating a doctor's decision to administer a nerve block injection in a particular location, an intelligent jury analysis requires some understanding of the results of giving the injection in various places; the skill required in pinpointing a specific location; and the likelihood of giving the injection in an unintended site.  We reaffirm our earlier conclusion, set forth in numerous decisions of this Court that, medicine being an applied science, the realm of reasonable choice is best defined by those engaged in the practice, and expert medical testimony on this issue is required. As aptly noted by the Justices of the Supreme Court of New Mexico, "The cause and effect of a physical condition lies in a field of knowledge in which only a medical expert can give a competent opinion. . . .  [Without experts] we feel that the jury could have no basis other than conjecture, surmise or speculation upon which to consider causation."  Woods v. Brumlop, 71 N.M. 221, 377 P.2d 520, 523 (1962).

See Toogood, 824 A.2d at 1149.

Here, Ortiz's arguments about the ability of a layperson to discern that the lump on his left shoulder warranted more treatment than he received at FCI Schuylkill are unavailing.[6] Ortiz's medical malpractice claim raises issues about the appropriateness of the examinations and treatment he received while confined at FCI Schuylkill as well as causation.

The uncontradicted evidence in the record shows that Ortiz received medical attention and treatment for the lump on his back. Presuming that the record confirms Ortiz's allegation that the lump increased in size over time, whether he should have been referred to a specialist or surgeon sooner, and whether he should have received different medical treatment, tests, or examinations for his lump at the times he visited with medical staff at FCI Schuylkill, are not matters within the common knowledge of the average layperson. Although Ortiz claims that the applicable standard of care required Dr. Mace-Leibson to physically examine the lump on his left shoulder, he provides no evidence that this was the applicable standard of care, and even if it was, that Dr. Mace-Leibson or any other medical professional at FCI Schuylkill deviated from the accepted medical standard, particularly while providing medical care to inmates like Ortiz during the Covid-19 pandemic.

_____

[6] In his complaint, Ortiz limits his medical malpractice claim to Dr. Mace-Leibson's alleged failure "to provide [him] with reasonable medical care[,] including[,] but not limited to[,] an actual physical exam where the physician would touch the injured area in an effort to make a clinical diagnosis." See (Doc. No. 1 at 17). He alleges that Dr. Mace-Leibson breached her duty to give him a physical exam "by failing to open the door, physically touch [his] left shoulder, and conduct a full physical examination of the area on [his] body." See (id.). He further alleges that this breach "caused [him] to suffer with extreme, unbearable, and excruciating pain for nearly two years and further caused [him] to suffer permanent injury to his left arm and hand in that he still suffers from numbness and weakness to the area." See (id.). Based on these allegations, it is arguable that Ortiz's medical malpractice claim is limited to Dr. Mace-Leibson's sole visit with him on March 2, 2020, or is at least limited to her, and no other medical professional at FCI Schuylkill's, interaction with him during the period at issue. Nonetheless, the Court will address Ortiz's medical malpractice claim as if it pertains to the medical treatment he received at FCI Schuylkill until the date of Dr. Fisher's surgery to remove his lipoma because the ultimate result in this case would not change.

In addition, Ortiz claims that the failure to properly examine and treat his lump (which was later diagnosed as a lipoma) caused him "to suffer permanent injury to his left arm and hand in that he still suffers from numbness and weakness to the area." See (Doc. No. 1 at 17). Other than Ortiz's belief that the delayed treatment of his lipoma caused permanent injury to his left arm, there is no evidence in the record showing that he has suffered such a "permanent" injury and, more importantly, no evidence that any delayed treatment of his lipoma (or any aspect of his lipoma) was the proximate cause of any issues with his left arm and hand. Moreover, it is beyond common knowledge to determine what injury, if any, Ortiz sustained due to Dr. Mace-Leibson not touching the lump on his shoulder on March 2, 2020, or any delays in treatment thereafter. Ortiz needs an expert to explain to the jury what should have been done under the circumstances (i.e., the applicable standard of care), whether Dr. Mace-Leibson or other FCI Schuylkill medical professionals deviated from that standard of care (i.e., breached the applicable standard of care), and whether any alleged deviations from the applicable standard of care caused his emotional injuries and physical injuries to his left arm and hand (i.e., proximate cause). Because issues relating to the absence of due care and causation are not sufficiently obvious to permit a factfinder to decide Ortiz's medical malpractice claim, and the proper diagnosis and treatment of a lipoma is beyond common knowledge, the Court will grant the Government's motion for summary judgment on this claim.

### 3. Ordinary Negligence

The Government moves for summary judgment on Ortiz's FTCA claim for ordinary negligence because (1) his ordinary negligence claim is actually a medical malpractice claim insofar as both claims are based on the same alleged breach—the failure to properly and promptly treat the lump on his left shoulder/upper back, (2) the Discretionary Function

Exception to the FTCA bars Ortiz's claim to the extent he bases it on the BOP's Covid-19 policies and procedures, and (3) his ordinary negligence claim is meritless.  See (Doc. No. 51 at 25–43).  As explained below, the Government is entitled to summary judgment on Ortiz's ordinary negligence claim.

Ortiz does not expressly address any of the Government's arguments in favor of summary judgment on his ordinary negligence claim in his opposition or sur-reply briefs. Instead, Ortiz repeatedly references the standard applicable to deliberate-indifference-to-serious-medical-needs claims under the Eighth Amendment and cases addressing deliberate-indifference claims in those portions of his submissions in which he does not discuss medical malpractice or the need for an expert at the summary judgment stage.  See, e.g., (Doc. Nos. 61 at 1–2, 5–7; 64 at 1–5).  Ortiz's failure to address any of the Government's arguments for summary judgment constitutes a waiver of his ordinary negligence claim.  See Brenner v. Loc. 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283, 1298 (3d Cir. 1991) ("It is well established that failure to raise an issue in the district court constitutes a waiver of the argument."); Reilly v. Lehigh Valley Hosp., 519 F. App'x 759, 762 (3d Cir. 2013) (unpublished) (concluding that the plaintiff waived argument on appeal because, inter alia, he did not oppose the defendant's "summary judgment motion on th[at] ground in the District Court"); Brown v. Johnson, 116 F. App'x 342, 345 (3d Cir. 2004) (unpublished) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal"); Campbell v. Jefferson Univ. Physicians, 22 F. Supp. 3d 478, 487 (E.D. Pa. 2014) ("[W}hen a plaintiff responds to a defendant's summary judgment motion but fails to address the substance of any challenge to particular claims, that failure 'constitutes an abandonment of those causes of action and essentially acts as a waiver of th[o]se issues.'"

(quoting Skirpan v. Pinnacle Health Hosps., No. 07-cv-01703, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010)), report and recommendation adopted, 2010 WL 3632702 (M.D. Pa. Sept. 10, 2010)); Wilkes-Barre Fire Fighters Ass'n Loc. 104, No. 04-cv-01920, 2006 WL 3742700, at *3 n.1 (M.D. Pa. Dec. 18, 2006) ("Even if Plaintiff did raise these claims in his Amended Complaint, because he ignored them at summary judgment, they are deemed waived." (citing Scott v. Beard, No. 02-cv-00691, 2006 WL 2645150, at *4 (M.D. Pa. Sept. 14, 2006), aff'd, 252 F. App'x 491 (3d Cir. 2007) (unpublished))), aff'd sub nom. Turinski v. Loc. 104 Int'l Ass'n of Fire Fighters, 269 F. App'x 184 (3d Cir. 2008) (unpublished); see also Gray v. White, 18 F.4th 463, 469 (5th Cir. 2021) ("[W]hen a party fails to raise an argument in opposition to a motion for summary judgment and instead raises it for the first time in a motion to alter or amend judgment, that argument is waived." (citation omitted)); Paskert v. Kemna-ASA Auto Plaza, Inc., 950 F.3d 535, 540 (8th Cir. 2020) ("The failure to oppose a basis for summary judgment constitutes waiver of that argument, because the non-moving party is responsible for demonstrating any genuine dispute of material fact that would preclude summary judgment." (citation and internal quotation marks omitted)).  Accordingly, the Court will grant the Government's motion insofar as it seeks summary judgment on Ortiz's FTCA ordinary negligence claim.[7]

### 4.   NIED

The Government moves for summary judgment on Ortiz's NIED claim.  It argues that Ortiz "cannot establish a prima facie claim of medical or ordinary negligence because he cannot establish that the United States deviated from the medical standard of care or otherwise breached

---

[7] Even if the Court determined that Ortiz opposed the Government's motion by arguing that there was a genuine issue of fact as to his ordinary negligence claim, the Court would still conclude that Ortiz waived this cause of action by failing to address the Government's arguments about his ordinary negligence claim sounding in medical malpractice and the application of the Discretionary Function Exception.

a duty owed to him or that any such breach was the cause of harm to him." See (Doc. No. 51 at 44).[8] The Court need not address the substance of the Government's argument because, as with his ordinary negligence claim, Ortiz waived his NIED claim by failing to address the Government's arguments for summary judgment on this claim in his opposition brief or his sur-reply brief, and he does not otherwise mention NIED at all in either submission. See generally (Doc. Nos. 61, 64). Therefore, the Court will also grant the Government's motion for summary judgment on Ortiz's FTCA NIED claim.

## IV.    CONCLUSION

For the reasons stated above, the Court will grant the Government's motion for summary judgment, direct the Clerk of Court to enter judgment in its favor and against Ortiz on Ortiz's remaining FTCA claims for medical malpractice, ordinary negligence, and NIED, and close this case. An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

---

[8] "[A]bsent a finding of negligence, [a] negligent infliction of emotional distress claim cannot survive." Jordan v. Pa. State Univ., 276 A.3d 751, 774 (Pa. Super. Ct. 2022) (citation and internal quotation marks omitted). In other words, a plaintiff must establish a negligence claim to prevail under any theory of a negligent infliction of emotional distress claim. See id.

In addition to having to allege an underlying negligence claim, a negligent infliction of emotional distress claim is limited to the following four (4) theories of recovery under Pennsylvania law: "(1) situations where the defendant owed the plaintiff a pre-existing contractual or fiduciary duty (the special relationship rule); (2) the plaintiff suffered a physical impact (the impact rule); (3) the plaintiff was in a zone of danger and reasonably experienced a fear of immediate physical injury (the zone of danger rule); or (4) the plaintiff observed a tortious injury to a close relative (the bystander rule)." See id. at 774 (citation and internal quotation marks omitted)); Toney v. Chester County Hosp., 961 A.2d 192, 197–98 (Pa. Super. Ct. 2008), aff'd, 36 A.3d 83 (Pa. 2011) (recognizing these same four elements (citation omitted)).